## EXHIBIT SHEET

## DEPOSITIONS

A.  SCOTT NELSON, ESQ. DEFENDANT'S ATTORNEY
B.  DERON COLEMAN, WITNESS
C.  DANTE KWAN RHODES, DEFENDANT
D.  MARY TERRELL, WITNESS
E.  SHANE FLESHER, WITNESS
F.  IOWA DUBUQUE COUNTY NO. PCCV107576 -COURT OF AOOEALS-
    NO. 21-0220 "PROCEDENDO"

## EXHIBITS

(1).    DECEMBER 12, 2016 PLEA, TRANSCRIPT OF PROCEEDINGS
        STATE OF IOWA              CASE NO. FECR093623
               V.                  S. CT. 21-0229
        DANTE RHODES
        HON. THOMAS A. BITTER, JUDGE
        DUBUQUE COUNTY COURTHOUSE, DUBUQUE, IOWA

(2)     FEBRUARY 2, 2018          CASE NO. FECR093623
        TRANSCRIPT OF PLEA SENTENCING AND PROBATION REVOCATION
        DUBUQUE COUNTY COURTHOUSE
        HON. MICHAEL J. SHUBATT, JUDGE
        STATE OF IOWA
               V.
        DANTE RHODES

(3)     MARCH 18, 2012 TRANSCRIPT OF PROCEEDINGS
        HON. MICHAEL J. SHUBATT, JUDGE
        IOWA STATE               CASE NO. PCCV107576
               V.
        DANTE RHODES
        IN THE IOWA DISTRICT COURT, DUBUQUE COUNTY

DEPOSITION A.

SCOTT NELSON, ESQ. DEFENDANT'S ATTORNEY

1    IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

2 DANTE KWAN RHODES,   )
            )
3     Plaintiff,  )
            ) Case No. 01311 PCCV107576
4 vs.         )
            ) DEPOSITION OF
5 STATE OF IOWA,    ) SCOTT NELSON
            )
6     Defendant.  )

7

8

9 APPEARANCES:  ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
         P.L.L.C., 110 West Main Street, P.O. Box
10       306, Epworth, Iowa 52045, appeared on
         behalf of the Plaintiff.
11
         ASSISTANT COUNTY ATTORNEY SHEA M. CHAPIN,
12       Dubuque County Attorney's Office, Dubuque
         County Courthouse, 720 Central Avenue,
13       Dubuque, Iowa 52001, appeared on behalf
         of the Defendant.
14
 On cell phone: Dante Kwan Rhodes, Plaintiff
15

16

17    Deposition of SCOTT NELSON, taken at the

18 Dubuque County Attorney's Office, Dubuque County

19 Courthouse, 720 Central Avenue, Dubuque, Iowa, on

20 March 6, 2020, commencing at 1:27 o'clock p.m., before

21 Dixie Shelton, a Certified Shorthand Reporter in and

22 for the States of Iowa and Illinois, in the

23 above-entitled matter.

24

25

1                          INDEX

2        WITNESS                        EXAMINATION

3    Scott Nelson      (Ms. Chapin)           3

4                      (Mr. Hoover)           9

5                      (Ms. Chapin)          22

6                      (Mr. Hoover)          24

7

8

9                        EXHIBITS

10      Exhibit                         Referenced

11   State's Exhibit E                       4

12   State's Exhibit A                      22

13

14

15

16   Certificate of Shorthand Reporter      28

17

18

19

20

21

22

23

24

25

1                      SCOTT NELSON,

2     being first duly sworn, was examined and testified as

3     follows:

4     EXAMINATION BY MS. CHAPIN:

5     Q.    Please state your name and spell it for the

6           record.

7     A.    Scott Nelson, N-e-l-s-o-n.

8     Q.    Mr. Nelson, where are you employed?

9     A.    I am employed at my own office.

10    Q.    Okay, and what type of office do you have?

11    A.    Sole practitioner, law firm.

12    Q.    Okay.  You're an attorney?

13    A.    I am.

14    Q.    And how long have you been an attorney in Iowa?

15    A.    About thirty years.

16    Q.    Okay.  Where did you go to law school?

17    A.    University of Iowa School of Law.

18    Q.    And when were you certified to practice law in

19          Iowa?

20    A.    1991.

21    Q.    Excellent.  In the course of your work as an

22          attorney have you ever had the chance to interact

23          with Dante Rhodes?

24    A.    I don't know if I'd call it a chance but, yes, I

25          did represent Mr. Rhodes at one point.

1   Q.   Okay, and do you recall representing him in April

2        of 2014?

3   A.   To some degree, yes.

4   Q.   And what do you recall about representing him?

5   A.   That's a pretty vague question.

6   Q.   It is a vague question.

7   A.   I just recall representing him.  He had been

8        charged with -- I believe it was selling heroin.

9        There were a couple counts of that.

10   Q.   Okay, and I'm going to hand you what -- or

11        actually it's State's Exhibit E.  Do you

12        recognize that?

13   A.   I do.

14   Q.   Okay, and how do you recognize that?

15   A.   That would have been given to me early in the

16        case prior to looking at any bond reviews or any

17        bond issues.  That's something that the

18        Department of Corrections does on everyone that's

19        arrested at least on felonies.

20   Q.   Okay, and I believe Mr. Flesher from the Public

21        Defender's Office came in this morning and

22        testified that that's his handwriting on the

23        bottom and that he had taken notes during his

24        interview with Mr. Rhodes.  In representing

25        Mr. Rhodes, Mr. Nelson, did you ever rely on the

1        information that was on Exhibit E?

2   A.   I have to say I have no specific recollection.

3        However, what I would commonly do in a situation

4        like this would be review this information and

5        then go forward in whatever manner was

6        appropriate.

7   Q.   Okay, so with the information on here indicating

8        that Mr. Rhodes lived in Dubuque from 2010 to

9        2012, that he had been in Milwaukee most of his

10       life and he's probably just lost his job in

11       Milwaukee, what would that lead you to believe in

12       your representation of him?

13   A.   That he was residing in Milwaukee.

14   Q.   Okay.

15   A.   And though I don't have any specific

16       recollection, I probably would have talked to him

17       about that and would have confirmed that with him

18       at the time.

19   Q.   Okay, and during the course of your

20       representation, Mr. Nelson, do you recall setting

21       up a proffer for Mr. Rhodes to proffer to the

22       Dubuque Drug Task Force?

23   A.   I do.

24   Q.   And can you tell us a little bit about that?

25   A.   Again, it's been a long time ago and I've had a

1       lot of cases between then and now, but a lot of

2       this would be what typically would happen and not

3       so much specifically on this case, but it would

4       have been arranged between the prosecutor and the

5       Task Force.  I would have set that up, talked to

6       them and then went in and done this proffer.  I

7       would have been there with him during that

8       proffer and then negotiate thereafter as to what

9       we're going to accomplish post-proffer.

10  Q.  Okay, and do you recall the impact that the

11      proffer that you set up for Mr. Rhodes, the

12      impact that that had on the plea negotiations for

13      him?

14  A.  That had a good impact.  He helped himself

15      greatly by doing the proffer.  As I recall, the

16      prosecutor, Mr. Gallagher, wanted him to go to

17      prison, and as a result of that proffer we were

18      able to work out a suspended sentence to where he

19      did not go to prison.

20  Q.  And it's my understanding that with that

21      suspended sentence, Mr. Nelson, that he also was

22      not required to reside at the residential

23      facility?

24  A.  No, he was placed on probation.

25  Q.  And his two charges would be concurrent if

1  revoked?

2 A. Yes.

3 Q. One of the issues that Mr. Rhodes is bringing up

4  is that he believes that you were ineffective for

5  not raising a statute of limitations argument.

6  Can you give us a little insight as to why a

7  statute of limitations issue was not brought up?

8 A. Again, this has been a long time ago and I don't

9  have specifics on it, but I can tell you that I

10  think that at the beginning of this my belief was

11  that he was residing in Milwaukee and as far as

12  the statute of limitations thing, it was not

13  raised because of that because if he's out of

14  state, that tolls that. Secondly, I think at

15  some point we ended up getting this all worked

16  out and went forward with the plea as opposed to

17  raising that issue because that would have an

18  impact as well on which way the case would go.

19 Q. Okay.

20 A. Typically Mr. Gallagher, if you'd raise an issue

21  like that up front, he would be reticent at best

22  to go forward with a suspended sentence later.

23 Q. So if you would have raised some type of a --

24  either a Motion to Suppress or a Motion to

25  Dismiss based on a statute of limitations

1      argument or even a due process argument, it would

2      likely be that the State then would have sought

3      an imposition of sentence had the Defendant been

4      found guilty or pled guilty.

5  A.  That would be my opinion, and again I don't have

6      any specific recollection on this, but that is

7      normally how things would proceed. I would have

8      looked at this at the time. I don't have

9      specific recollection, but that would be

10     something that typically I do look at.

11 Q.  Okay, and then during your representation of the

12     Defendant prior to his sentencing did he fail to

13     appear?

14 A.  He did. At one point -- this was strung out. I

15     think he was -- the actual underlying offense

16     took place, I believe, in 2010 and then he was

17     gone and picked up on warrant I believe in 2014

18     and then halfway through my representation in

19     2015 he disappeared and it went to warrant. He

20     failed to appear and lost track of him. Then he

21     got picked up on warrant and that's when we

22     ultimately took care of everything.

23 Q.  Okay, and if I recall as well, Mr. Nelson, you

24     were actually able to get him an Alford plea. He

25     wasn't required to plead guilty to the offenses.

1   A.   That is correct.

2   Q.   And do you recall if any of his mail had been

3        returned to you?

4   A.   That I don't recall.  I think that he was in jail

5        most of the time and that mail would have got

6        through and afterwards when he was released, I

7        don't know if I had an address to send it to or

8        not.  I just -- I don't recall that.

9   Q.   Okay.

10  A.   Typically I would get an address as to where he

11       was going to be so that I could send him a copy

12       of the judgment.

13  Q.   Okay, and even though he failed to appear during

14       your representation, you were still able to get

15       him the Alford plea with a suspended sentence.

16  A.   Yes.

17            MS. CHAPIN:  Okay.  Thank you.  Nothing

18       further.

19  EXAMINATION BY MR. HOOVER:

20  Q.   How are you doing today, Mr. Nelson?

21  A.   Having a lovely day, Mr. Hoover.

22  Q.   So did you have any specific conversations with

23       Mr. Rhodes about the statute of limitations?

24  A.   That I cannot recall specifically, but what I

25       would say is that is something that I would

1      normally check out and look at at the beginning

2      of the case.  Whether that happened specifically

3      with him or how that happened, I don't have a

4      recollection of that specifically.  That's been

5      too many years ago now.

6  Q.  Fair enough.  Probably 2014 is when that issue

7      would have been raised if it was?

8  A.  Yes.

9  Q.  And again, I understand you don't necessarily

10     have a recollection, but did you ask him where he

11     was from 2012 to 2013?

12  A.  I think there would have been a discussion about

13     that.  Now, specifically did I ask that, I don't

14     recall, but when I have this sheet from the

15     Department of Corrections, I do look at this

16     stuff and I would have confirmed what was on here

17     with him.  I wouldn't just ignore that.  That's

18     something that would be discussed.

19  Q.  All right, and do you recall whether or not you

20     discussed the specifics with Mr. Rhodes

21     specifically?

22  A.  Of the --

23  Q.  Yes.

24  A.  Where he was living?

25  Q.  Yeah.

1    A.    I don't recall the specific conversation, but I'm

2        saying that that's what I would do, so I'm

3        certain that I had that conversation. I just

4        don't recall the specifics of it.

5    Q.    Okay, and did you ever obtain a copy of the

6        search warrant?

7    A.    Yes.

8    Q.    Okay, and do you recall when you would have

9        obtained a copy of the search warrant?

10    A.    Somewhere along the way.

11    Q.    Okay.

12    A.    That usually happens fairly early. I would do it

13        to -- a request for discovery or motion and that

14        would have been provided.

15    Q.    And do you recall whether or not they were able

16        to find any drug or drug paraphernalia in his

17        place of residence at that time?

18    A.    What I recall is in the search warrant they found

19        scales, they found syringes, they found -- they

20        found the drugs. They found a whole lot of

21        things that did not bode well for Mr. Rhodes.

22        That would be the PIC sheet. That should be

23        included, the things that they seized.

24    Q.    Okay. If the PIC sheet shows that the only thing

25        they found was actually in -- that the only thing

1      involving heroin was found in the visitor's

2      purse, would that be consistent with your

3      recollection of what they found?

4   A. I just recall that they found a whole lot of

5      things.

6   Q. Okay, and you're talking about the box of unused

7      syringes?

8   A. I recall there being some syringes involved.

9   Q. Okay, and did you take any other steps to

10     investigate the claims made by the State?

11  A. In terms of what?

12  Q. In terms of did you investigate the two I guess

13     people that they found the heroin on?

14  A. In terms of what?

15  Q. In terms of did they have a past drug history,

16     had they themselves been in trouble for any kind

17     of dealing or delivery of narcotics?

18  A. That I don't recall.  I'm not sure what good that

19     would have done.  I don't remember doing that but

20     I can't say that I didn't.

21  Q. Okay.

22  A. Typically again I would look at that sort of

23     thing, in this case probably not so much because

24     ultimately we ended up negotiating a plea deal

25     and when you look at it, sometimes there might be

1      issues that would spring up that, you know, would

2      make me curious, that would make me want to look

3      deeper, something that I might want to pursue,

4      but when negotiations are going well and you're

5      going to end up with a favorable result, the rest

6      of that doesn't seem to matter all that much, so

7      you've got to weigh that out and balance it.

8   Q.  Do you recall when the incident happened as far

9      as Mr. Rhodes allegedly selling or delivering the

10     heroin to these other people?

11  A.  In terms of what do you mean?  When did the

12     incident occur?

13  Q.  Yeah.

14  A.  As alleged, it was in 2010, late 2010 as I

15     recall.

16  Q.  Been around April, 2010, would that --

17  A.  That could be.

18  Q.  Okay, and do you recall when he was ultimately

19     arrested on these charges?

20  A.  I think that would have been 2014.

21  Q.  And it would be fair to say probably pretty close

22     to April of 2014?

23  A.  If that's what it is, that's what it is.

24  Q.  And would you agree with me if Mr. Rhodes say had

25     moved to Milwaukee after the three years, that

1    that would not have tolled the three year statute

2    of limitations?

3  A.  I wouldn't speculate on that.

4  Q.  Okay.

5  A.  I haven't -- you know, I mean that's probably the

6    case. I don't know. I mean, I probably looked

7    at that. I have not looked at that in years. If

8    that's the case, that's the case.

9  Q.  Okay.

10  A.  I think there is a three year statute. The fact

11    that he was in Milwaukee would have tolled that

12    so --

13  Q.  Right, as long as it was within that three year

14    statute of limitations; correct?

15  A.  Yes.

16  Q.  So if he had moved to Milwaukee after the three

17    years had already expired, then it would not have

18    tolled the statute; correct?

19  A.  I thought we had this discussion of frogs before

20    we started this deposition and I don't like "if"

21    questions, what ifs.

22  Q.  All right.

23  A.  I deal with what is, not with what if.

24  Q.  Right, but in this case it's important you would

25    agree that the issue of when he moved to

1       Milwaukee, if he indeed did, it would be an

2       important issue; correct?

3  A.  I don't know that I would have an opinion on

4       that. I think ultimately that would be up to a

5       court to decide whether or not the statute was

6       tolled or whether it was not.

7  Q.  And you didn't raise that; correct?

8  A.  Specifically, no.

9  Q.  And would you agree that a dismissal is

10      preferable to any other kind of plea deal?

11  A.  Again, that's a loaded question because you're

12      assuming there would be a dismissal on that.

13      You're taking a chance to go forward seeking a

14      dismissal on those grounds and in the event that

15      you are not successful, whatever you've got going

16      in terms of negotiations may not be there.

17  Q.  Okay.

18  A.  So again, you've got to do that on balance.

19  Q.  Did you investigate any -- try to locate any

20      evidence that he would have been in Iowa within

21      that three -- three year statute of limitations?

22  A.  I don't believe I had any cause to do so at the

23      time. I believed that Mr. Rhodes was residing in

24      Milwaukee. I had no reason to believe that he

25      lived anywhere else.

1   Q.   Did he ever tell you that during that three year

2        period he was living in Milwaukee?

3   A.   No.

4   Q.   And your recollection of as far as the warrant

5        was, do you recall what the basis for the

6        warrant --

7   A.   Which warrant?

8   Q.   The one of his apartment where --

9   A.   Search warrant.

10  Q.   The search warrant, yeah.

11  A.   And do I recall the basis for the warrant?

12  Q.   Yeah, what basis they gave for the warrant?

13  A.   Oh, God, I couldn't tell you that sitting here

14       today.  It is what it is.  It's in the warrant

15       so --

16  Q.   If it was based on the information of someone

17       that they found with heroin on them, do you

18       recall if there was any other corroborating

19       evidence to Mr. Beeler's claim?

20  A.   I don't know.

21  Q.   Again, it was quite a while ago; right?

22  A.   Yes, it's been a long time ago.

23  Q.   At the time that you were investigating this

24       case, do you know if the State still had -- got

25       in contact with the two witnesses who would have

1      then if it was such a huge concern?  Why is it

2      that he seems to know everything about most

3      things but now it takes him years before he

4      figures that out?  Now, that was something that I

5      would have looked at at the time as I stated.  I

6      don't have specifics, that's been four or five

7      years ago, but that is something as a lawyer that

8      I look at in every case so I looked at that.

9              Obviously it wasn't something worth

10     pursuing, which could have been for numerous

11     reasons.  No. 1, there may not have been a whole

12     lot of merit to it because my understanding was

13     he had been living in Milwaukee at the time.  No.

14     2, by the time that comes up, we were negotiating

15     and things were looking pretty good at getting

16     him out from under this thing so, like I said, on

17     balance you look towards getting this thing done.

18     He was happy with that when it was done that way,

19     didn't have any problems with it.  My

20     understanding is he's now in federal custody so

21     this conviction on the State -- his plea now

22     affects that so suddenly we've got problems.

23     That's, you know, a problem with me.

24  Q.  Sure.

25  A.  I think everything was done absolutely well at

1    been able to say that Mr. Rhodes sold them the

2    heroin?

3  A.  I have -- I don't know.

4  Q.  Do you recall if Mr. Rhodes ever said something

5    like, "I don't care what you do, just get me out

6    of here"?

7  A.  Well, I heard a lot of things from Mr. Rhodes.

8    If you look at the file, he was filing things

9    with the Court complaining about various things.

10   He was telling me how things should go.  He

11   seemed like he was pretty well up on his case so

12   in my opinion, you know, if he was that good

13   at -- as good as what he said he was, that he

14   should have, you know, pushed this whole issue

15   about living in Iowa at the time as opposed to

16   waiting until now, a little curious as to the

17   lateness of coming up with that.

18  Q.  All right.  If he testified that no one prior to

19   my filing of the post-conviction relief had ever

20   talked to him about the statute of limitations,

21   would you disagree with him?

22  A.  No.  I mean, he can say that all he wants.  I'm

23   just -- what I just said was he filed a whole lot

24   of stuff in that case and he was wanting to tell

25   me how to do my job, and why didn't he raise it

1             Now, if he would have said, "Oh, no, no,

2      that's not correct, he wrote that down and it's

3      not correct," I would have inquired, "Okay, what

4      is correct?  Let's get to the bottom of it."

5      That didn't happen, which tells me then that he

6      did not dispute that which means there was really

7      no issue there at the time.

8             (Mr. Hoover is speaking to the Plaintiff

9      on his cell phone.)

10  Q.  At any time did Mr. Rhodes ask you for a copy of

11      his Minutes of Testimony or police reports?

12  A.  Probably not because I would have sent them to

13      him as a matter of course.

14  Q.  Okay.  Do you recall ever telling him that you

15      weren't his secretary?

16  A.  Probably.

17  Q.  Okay.

18  A.  I don't recall that specifically with him but I

19      have said that to quite a few people through the

20      years and it irritates me when I send things to

21      people and they know when court dates are, I tell

22      them all the information, and then they call up

23      and say, "When's my next court date," and I

24      usually start with a question, "What did my

25      letter say your next court date was," and then

SHELTON REPORTING (815) 947-3141

1       the time. I don't do shotty work, I do good

2       work. I took care of him. We got him out from

3       under that. We did things well and here we are

4       how many years later and I'm getting a complaint.

5  Q.   Just so I can make sure I'm clear on your answer,

6       do you specifically recall whether or not you

7       discussed with Mr. Rhodes himself the possibility

8       of a statute of limitations issue?

9  A.   Again, I don't recall specifically, but that is

10      something that I would have done.

11  Q.   You would have looked into it or you would

12      have talked to --

13  A.   That is common -- well, that's common practice

14      you would look at it. First of all, when he says

15      he lived in Milwaukee here, he told apparently

16      whoever -- was it -- Mr. Flesher apparently, said

17      he lived in Dubuque 2010 to '12, Milwaukee most

18      of life. Okay. I probably would have talked to

19      him about that. That's what I do when I get

20      these. I sit down, I talk to them, verify that.

21      Now, had he agreed with that, which I think is

22      probably what happened, again no specific

23      recollection of that, but given the way things

24      are, I'm sure that he probably said that's what

25      it was so that ends the inquiry.

1    they say, "Well, I don't know, I didn't look at

2    that," and that's when I tell them, "I'm not your

3    personal private secretary.  You need to read the

4    stuff that I send you.  It's important.  I'm

5    busy.  You don't need to call me and have me tell

6    you when your next court date is when I've

7    already told you."

8    Q.    Okay.

9    A.    So yes, I probably said that.

10   Q.    Okay.

11   A.    If in fact he called me and asked me when his

12         next court date was, I probably did say that.

13   Q.    What if his recollection was that that was your

14         response to him asking for copies of his Minutes

15         of Testimony and police reports?

16   A.    Well, we're back to those what if questions.  If

17         he said that, then that's not correct.

18   Q.    Okay, and did he ask you to set up depositions?

19   A.    Probably not.  If we would have talked about it,

20         there would have been two things.  No. 1, would

21         depositions be necessary.  In this case not.

22         Secondly, I probably -- if he would have brought

23         that up, I would have said I typically do not do

24         depositions, there has to be a good reason to,

25         because I think there's just as much to give away

1    than there is to gain when you do depositions in

2    this type of a case. Now, if there was a

3    specific reason to depose somebody, I certainly

4    would have pursued that.

5  Q.  Okay.

6  A.  But again, we get towards the end of this where

7    we're working towards this plea deal. All of

8    those other decisions get pushed to the back

9    burner while we pursue the plea deal, which came

10    out very beneficial to him, and he was very happy

11    with that at the time when it got resolved.

12           (Mr. Hoover is speaking to the Plaintiff

13    on his cell phone.)

14           MR. HOOVER: Nothing further.

15  EXAMINATION BY MS. CHAPIN:

16  Q.  Mr. Nelson, I'm going to hand you State's

17    Exhibit A. Mr. Hoover had asked you a few

18    questions about the search warrant for this case

19    and that's what State's Exhibit A is, and are you

20    familiar with that document, sir?

21  A.  Oh, I'm sure I've seen it.

22  Q.  Okay. In the document it -- the search warrant

23    for Mr. Rhodes' residence was based on his

24    delivery of heroin to confidential informants.

25    Does that refresh your recollection at all?

1    A.    That's what the affidavit says, yes.

2    Q.    Okay.  Are you more familiar with it now looking

3          over it that that was part of your case file?

4    A.    It was part of the case file.  I just don't

5          recall the specifics of it.

6    Q.    So in your file you had the search warrant where

7          your client, Mr. Rhodes, had sold heroin to a

8          confidential informant.  He had listed the

9          information that he probably had lost his job in

10         Milwaukee, that he had lived in Milwaukee his

11         whole life, and you were able to still set up a

12         proffer for a really good deal to him.  Does that

13         sound accurate?

14   A.    Generally, yes.

15   Q.    And if you had pursued depositions unnecessarily,

16         would it have put the good deal in jeopardy?

17   A.    Possibly.    I would just note here, too, that the

18         things seized, he had cash, he had syringes, gym

19         bags, all sorts of things that -- digital scale,

20         so all of the things that one looks for for

21         distribution seems to be found there, which is of

22         concern in that type of a case.

23   Q.    There was substantial evidence to likely convict

24         Mr. Rhodes of the delivery of heroin?

25   A.    That would be a concern I would have in looking

1          at it.

2     Q.   It's my understanding, Mr. Nelson, that

3          Mr. Rhodes faced up to twenty years in prison on

4          this?

5     A.   Yes.

6     Q.   And he received a ten year concurrent suspended

7          sentence with street probation?

8     A.   Yes.

9               MS. CHAPIN:  Okay.  Thank you.  Nothing

10         further.

11    EXAMINATION BY MR. HOOVER:

12    Q.   All right.  Would you agree that all those things

13         are also indicative of use?

14    A.   Not necessarily.  He's not charged with using,

15         he's charged with distribution, and when you put

16         that in front of a jury, they're going to be

17         thinking distribution.  You can argue use but

18         where are you going to be?  Dangerous, dangerous

19         to go into trial on.

20    Q.   All right.  I think you said something about as

21         far as the depositions could have possibly

22         hindered or hampered the plea agreement; correct?

23    A.   That's possible.  I can't say with specificity

24         that that did happen.  I would just say that that

25         can happen and I also said that I typically do

1        not do depositions because I find oftentimes

2        there's more harm than good.

3  Q.  And sometimes good things can come out of

4        depositions, too, though; right?

5  A.  Well, you have to look at that ahead of time and

6        know what you're trying to do.  When you

7        undertake a deposition, if you just go in there

8        blind and start asking questions -- you're a good

9        lawyer, Mr. Hoover.  You know you don't go ask

10       questions that you don't know the answer to, so

11       if you go in there and blindly start asking

12       questions, you could hang your client in that

13       deposition.

14           MR. HOOVER:  Okay.  Hold on.  Let me

15       make sure --

16           (Mr. Hoover is speaking to the Plaintiff

17       on his cell phone.)

18  Q.  Particularly when it came to Mr. Beeler, okay --

19        and Mr. Beeler was actually named in the warrant;

20        is that correct?

21  A.  I believe so, yes.

22  Q.  And other than Mr. Beeler saying that he got it

23        from Mr. Rhodes, did you see any other

24        corroborating evidence for Mr. Beeler's claim he

25        got it --

1   A.   In the --

2   Q.   In the application.

3   A.   In the affidavit?  I don't believe so.  I think

4        it just said that he indicated that he purchased

5        the product.

6   Q.   Okay, and again what did you believe was the

7        corroboration for Miss Cooper, who was the

8        individual found in the apartment, that she had

9        bought the heroin from Mr. Rhodes?

10  A.   Again, I don't know.  I haven't been in that file

11       in years.  What I can say in general is that

12       you've got an affidavit for a search warrant

13       where I've got somebody says he purchased heroin

14       from Mr. Rhodes.  Then you've got a search

15       warrant that finds syringes, finds gym bags,

16       finds scales, finds money, finds all those things

17       associated with the distribution of a product, in

18       this case heroin, and then you've got somebody

19       that says he purchased heroin.

20           When you put it all together, that's a

21       dangerous, dangerous situation.  Standing alone,

22       yeah, maybe what Mr. Beeler says kaput, but

23       you've got all this other evidence that supports

24       that.  When you go into a trial, you've got to

25       deal with all of that in whole, all together.

1       That's dangerous to go in and do that in a trial.

2       You know that.  I know that.  That's why we have

3       to be very careful about how we proceed.  In this

4       case we proceeded towards doing the proffer,

5       getting the agreement that we got, which quite

6       frankly as I sit here today looking back,

7       out-of-body experience, as a younger attorney I

8       did a pretty darn good job on that case.

9   Q.  Okay.

10              (Mr. Hoover is speaking to the Plaintiff

11      on his cell phone.)

12              MR. HOOVER:  No further questions.

13              MS. CHAPIN:  I have nothing further for

14      you, sir.  Thank you.

15              (The deposition was concluded at 2:00

16      p.m.)

17

18

19

20

21

22

23

24

25

SHELTON REPORTING (815)947-3141

1          CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Dixie Shelton, a Certified Shorthand Reporter
in and for the States of Iowa and Illinois, do certify
that, pursuant to the agreement herein contained, this
4  deponent came before me at the aforementioned time and
place, who was sworn by me to testify to the truth and
5  nothing but the truth concerning the matters in
controversy in this cause; that the deponent was
6  thereupon examined under oath and the examination was
reduced to writing by me, and the printed transcript is a
7  true record of the testimony given by said deponent and
all objections made.

8

9          I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken,
10  and, further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or
11  financially interested in the action.

12          In witness whereof I have hereunto set my
hand this 16th day of March, 2020.

13

14

15          _Dixie Shelton_
_____
Dixie Shelton
16  Certified Shorthand Reporter
IA License No. 600
17  IL License No. 084-003341
P.O. Box 222
18  Stockton, Illinois 61085

19

20

21

22

23

24

25

DEPOSITION B.

DERON COLEMAN, WITNESS

1          IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

2   DANTE KWAN RHODES,            )
                                 )
3            Plaintiff,          )
                                 )    Case No. 01311 PCCV107576
4   vs.                          )
                                 )    TELEPHONE DEPOSITION
5   STATE OF IOWA,               )         OF
                                 )    DERON COLEMAN
6            Defendant.          )

7

8

9   APPEARANCES:   ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
                   P.L.L.C., 110 West Main Street, P.O. Box
10                 306, Epworth, Iowa 52045, appeared on
                   behalf of the Plaintiff.

11
                   ASSISTANT COUNTY ATTORNEY SHEA M. CHAPIN,
12                 Dubuque County Attorney's Office, Dubuque
                   County Courthouse, 720 Central Avenue,
13                 Dubuque, Iowa 52001, appeared on behalf
                   of the Defendant.

14
    On cell phone:  Dante Kwan Rhodes, Plaintiff
15

16

17          Telephone Deposition of DERON COLEMAN, taken

18  in the 3rd Floor South Courtroom, Dubuque County

19  Courthouse, 720 Central Avenue, Dubuque, Iowa, on March

20  6, 2020, commencing at 11:22 o'clock a.m., before Dixie

21  Shelton, a Certified Shorthand Reporter in and for the

22  States of Iowa and Illinois, in the above-entitled

23  matter.

24

25

1                            INDEX

2       WITNESS                           EXAMINATION

3    Deron Coleman        (Mr. Hoover)            3

4                         (Ms. Chapin)           18

5

6

7

8                          EXHIBITS

9                      (No exhibits)

10

11

12

13

14   Certificate of Shorthand Reporter          21

15

16

17

18

19

20

21

22

23

24

25

                    SHELTON REPORTING (815)947-3141

1                       DERON COLEMAN,

2      being first duly sworn, was examined and testified as

3      follows:

4      EXAMINATION BY MR. HOOVER:

5      Q.    Mr. Coleman, can you state your name and spell

6            your last name for the record?

7      A.    My name is Deron Coleman.  Last name is spelled

8            C-o-l-e-m-a-n.

9      Q.    Okay.  And, Mr. Coleman, where do you currently

10           reside?

11     A.    In Milwaukee, Wisconsin.  Address is 5930 North

12           75th Street, Milwaukee, Wisconsin.

13     Q.    Okay, and are you currently employed?

14     A.    Actually I just had an interview this morning and

15           I got the job so I'm starting on the 16th.  I

16           just -- I left my old job about three weeks ago

17           and start a new one on the 16th of this month.

18     Q.    Congratulations on that.

19     A.    Thank you.

20     Q.    Where did you work previously?

21     A.    Communications support.  It's -- we got a

22           contract going on -- We Energies, which is the

23           big -- well, the light and gas company that's

24           here, we do all of their surveillance and access

25           control.

1   Q.   Okay, and how long did you work there?

2   A.   There -- I worked there for about six months.

3        Before then it was Safe Watch Surveillance.

4   Q.   Okay. Is it essentially the same type of work?

5   A.   Yeah, same type of work.

6   Q.   Okay, and how far did you get in school?

7   A.   I graduated high school, took some courses in

8        college but never finished.

9   Q.   Okay, and how do you know my client, Dante

10       Rhodes?

11   A.   That's my first cousin.

12   Q.   Okay, and would you say that you and Mr. Rhodes

13       are close?

14   A.   Yes, very close. We like brothers. My mother

15       and his mother are sisters and our grandmother

16       was our big connection point so it was just

17       like -- we just always around each other. He's

18       my first cousin.

19   Q.   Okay. Would you -- all right. Would you say

20       your relationship is so close that you would give

21       false testimony on behalf of him?

22   A.   Absolutely not.

23   Q.   And you understand you're under oath; correct?

24   A.   Absolutely.

25   Q.   And you understand what being under oath means;

1        right?

2   A.   Yes.

3   Q.   And what does that mean to you?

4   A.   Under oath, what it means to me is that I will be

5        held under perjury or whatever of lying or

6        basically something -- I can get charged if I'm

7        lying about something under oath.  I would not

8        put myself in that situation if I was trying to

9        do anything deceptive.

10  Q.   All right, and around the time of 2010 to around

11       2014 how would you describe your cousin,

12       Mr. Rhodes?

13  A.   Around that time he -- he had a drug problem that

14       he was hiding from everybody.  I knew something

15       was wrong but I didn't -- I couldn't put my

16       finger on it, but it was more so he was trying to

17       create distance between -- like his life-style

18       became different shall I say because his

19       life-style didn't add up to the standards that we

20       wanted for him.

21  Q.   Okay, and do you know, did Mr. Rhodes ever live

22       in Milwaukee?

23  A.   Yeah, he was raised in Milwaukee.

24  Q.   Okay.

25  A.   Yeah, he was raised, born and raised in

1      Milwaukee.

2  Q.  At some point did he move away from Milwaukee?

3  A.  Yes. He moved away around the time I was going

4      through a divorce and that was -- I'm not sure of

5      the exact date of my divorce, 2010, '11. I know

6      he was gone because I only talked to him over the

7      phone. He was asking me questions about it,

8      what's going on.

9  Q.  Okay, and do you know where he moved to once he

10     moved from Milwaukee?

11  A.  Yeah, he moved to Iowa with his girlfriend.

12  Q.  Okay, and what is his girlfriend's name?

13  A.  It was Tiffany all I remember. I don't know her

14     last name. I just know her name was Tiffany

15     because I had a childhood friend and her name was

16     Tiffany so I knew her as Tiffany.

17  Q.  Okay, and did you ever visit Mr. Rhodes in Iowa?

18  A.  Never.

19  Q.  Okay. All right, and after he moved to Iowa, did

20     he ever move back to Milwaukee?

21  A.  No, but he came -- he used to visit every once in

22     a like -- like he would come and just try to get

23     pills or something or something like that and go

24     back, but he always -- his home -- he lived in

25     Iowa and I thought that he was getting himself

SHELTON REPORTING (815)947-3141

1      together, you know, because you talk to him over

2      the phone, he was more so like I'm getting myself

3      together and he was like -- as he liked it there,

4      you know, and -- but I didn't know the situation

5      was bad until we had a family meeting and that

6      was to get him to take a rehab or something like

7      that and that's when I knew it was a bad

8      situation but, no, I thought he was up there

9      getting his life together but he really was

10     getting -- you know, it was worse.

11  Q.  And at that time did your grandma still live in

12     Milwaukee?

13  A.  Yes, she always lived in Milwaukee.

14  Q.  And do you know what the address is?

15  A.  2355 North 5th.

16  Q.  Okay, and have you ever used that for any purpose

17     as your address?

18  A.  Yes, I use it for -- use it for address before

19     like -- or just information like if I'm getting

20     something sent there because she had -- like

21     that's the pillar of our family, that house, so

22     it's more so -- her number -- her phone number

23     never changed for whatever. I've used that for

24     some time like passwords or something. I know

25     that's (unintelligible) never forget and like her

1    address is like -- that's -- you know, that's

2    grandma house.  That's not going anywhere so

3    yeah.

4 Q. And I think you testified earlier that you felt

5    like Mr. Rhodes was kind of trying to hide his

6    drug issues from the family?

7 A. Yes.

8 Q. Would he have been able to do that if he was

9    residing in Milwaukee?

10 A. Would he be able to hide his -- I would say no.

11    I mean, we've been -- we so close, you know, that

12    you would see the difference in him, you know,

13    and -- well, like I said, when he lived in Iowa

14    he kind of kept -- you know, like he'd be

15    talking -- he'd talk as if he was living like his

16    life was a regular life, you know, just got this

17    TV and I went here and this and that and I'm

18    trying to do this and -- you know, like as if he

19    was living a normal life and come to find out it

20    wasn't, you know.  I wasn't around him, you know.

21 Q. Do you know where in Iowa he was living?

22 A. No, I never -- when I talked to him, he had this

23    one place like -- I've never been there but he

24    told me that he lived in this one place and it

25    was -- him and the landlord didn't kind of get

1      along and then -- I know he lived in another

2      place. It was like an older white guy and he had

3      a son and so all of that was like details like

4      that, nothing like -- you know, no pictures or

5      anything like that, say I'm staying here now, I'm

6      doing this now. It was that kind of stuff.

7   Q.  Do you know, was he -- was he living in Dubuque

8      at some point?

9   A.  Yeah, that Dubuque -- that's where I would --

10      that's where I would know that he was at,

11      Dubuque. He used to always say Dubuque.

12   Q.  And what about -- do you recognize the name

13      Ottumwa?

14   A.  I probably heard of it before. I'm not sure. I

15      mean, I just -- I remember Dubuque, I remember

16      that, I remember -- and I'm -- just knowing, you

17      know, cities and stuff, like I remember that,

18      too, but I'm not -- the details of all of that I

19      probably wouldn't know because that wasn't the

20      basis of our -- my relationship with my cousin.

21      I was -- Iowa and all the details of being

22      around, you know, I wouldn't, but I know that's

23      where he was at.

24   Q.  Between 2010 to 2014 were you aware of any time

25      he was living with your grandmother?

A.  No, he didn't live in Milwaukee at all and if he did live in Milwaukee, that's the first place he would have went and, no, he didn't live -- because my grandmother wanted him to come back home. That was -- that's like my grandmother's baby I should sort of say, you know. It's like she wanted him back home, his mother wanted him in treatment, and he -- I just think since he didn't -- he wasn't ready for treatment, he kind of avoided the family to a certain extent but he always kept in touch but it was like over the phone, you know, that kind of stuff, and he might call and like say, "Hey, you know, I might need a couple dollars, can you wire me," you know, something like that. He might do something like that or, you know, but he wouldn't come around like that. He was -- his whole life became -- just became like a hustle.

Q.  Did he have any problems in Milwaukee with anybody?

A.  That I wouldn't know.

Q.  Okay, but you would know if he was staying at your grandmother's house.

A.  Absolutely.

Q.  And how often would you say that you see your

1      grandmother?

2   A.   Now not as much.  I probably see her twice a

3        month.  She's in a nursing home now, but before

4        when she lived in the city and she was -- I mean,

5        you know, she was just -- like normal life, a

6        couple times a week.  I used to go down there and

7        just sit and talk with her and, you know,

8        anything around the house, you know, before like

9        fixing whatever is wrong with her house like her

10       lock need changing or a pipe is clogged up or

11       something, that was -- that she always relied on

12       me to do all those things.

13  Q.   And visiting a couple times a week, you never

14       observed Dante there on a regular basis; is that

15       correct?

16  A.   No.  Dante didn't -- he didn't live there.  Like

17       my relationship with my grandmother, I mean

18       she -- like to me Dante was her baby.  To make

19       like -- even when I go see her today I always

20       bring up Dante because that's her -- you know,

21       like that's her baby, baby like -- crazy about

22       him so, no, I go down there and I would -- I

23       would actually talk to her about Dante, "Did you

24       talk to him" or -- "I mean, I talked to him" and,

25       you know, "How's he doing" because I know that's

1        something that she would like to -- you know,

2        that's how our conversation started is to talk

3        about, you know, Dante so, no, she wanted him

4        back home. She was worried about him, you know,

5        and stuff like that so -- like even when she was

6        in -- no, he didn't stay with her at all.

7 Q.    Okay. Knowing he was using, would you have

8        allowed him to stay with your grandmother?

9 A.    I couldn't stop him if he wanted to, you know, so

10       that's like I can't control what goes on in her

11       house. I can't say, "No, you can't stay there,"

12       but she -- she would have wanted him to stay

13       there, you know. She would have wanted -- she

14       wanted him to come back. He -- you know, he had

15       his girlfriend. He had a life that he was

16       living. He was just living a street life. He

17       didn't want to be around, you know. Like his

18       girlfriend wouldn't have been allowed to stay

19       with my grandmother. She didn't -- like only he

20       will be allowed, you know, so he was in a

21       relationship living a street life and he felt

22       like that was his way of freedom. That was his

23       getaway. He was able to survive or make it in

24       Iowa and that's what his plans was, and to my

25       understanding he just like -- he was -- from what

SHELTON REPORTING (815)947-3141

1      I thought, he was living okay.

2   Q.   Okay.  To your knowledge, did your grandmother or

3        anybody in the family ever receive any

4        correspondence from any law enforcement trying to

5        find Dante there?

6   A.   I wouldn't know.  I wouldn't know.

7   Q.   Okay.  Is that something that your grandma would

8        have likely brought up if she received something?

9              MS. CHAPIN:  Objection, speculation.

10  A.   I wouldn't know.  I wouldn't know.

11             MR. HOOVER:  I guess just for the record

12       that the State did make an objection to

13       speculation and at the -- at the time the judge

14       reads it, he'll rule on whether or not --

15             MS. CHAPIN:  Yeah.

16  Q.   Would it have been possible for Mr. Rhodes to

17       live in Milwaukee and you not know about it?

18  A.   Absolutely not.  Like me and cousin very close,

19       we close to this day, you know.  Like he just say

20       to me, "I just can't wait to get home and I can

21       show" -- you know, like, man, just talking -- he

22       is my older cousin and "I could be the big cousin

23       that always, you know, supposed to be and I just

24       feel so bad that I wasted so much time."  We are

25       really close.  Like that's my -- like a brother,

1       you know, and, you know, no, he couldn't have

2       lived here without me knowing, absolutely not.

3  Q.  Do you have a lot of family that lives in

4       Milwaukee?

5  A.  We do. I wouldn't say a lot but we do but we --

6       the way our family is designed is like my

7       grandmother and her family. Anybody else we kind

8       of know we could go up to them and say, hey, this

9       is our family, but our close-knit family is my

10      mother and my grandmother and my auntie and, you

11      know, stuff like that but -- so we got family but

12      our family is from my grandmother down.

13  Q.  Okay. Would it -- would it have been difficult

14      for Mr. Rhodes to hide in Milwaukee from his family?

15  A.  From us? No. I mean, yeah, he wouldn't -- that

16      was not -- that was not an option. We were never

17      like upset at him or he had to force to stay away

18      from us or stay out of our sight or anything like

19      that. That wasn't an option, you know, like --

20      no, he wouldn't stay -- he wouldn't have stayed

21      away. If he would have stayed away, I'd have

22      been like crazy. That would have been something

23      I would have like, "What's going on you with you,

24      man," if he was in the same city as me.

25  Q.  And he did come and --

1    A.    No.

2    Q.    I apologize. Did he come and visit Milwaukee?

3    A.    Rarely. He came -- like I said, he come -- if he

4             came, it was more so just to get drugs and to

5             leave -- his life became all about drugs and if

6             he did -- his home base was Iowa and

7             everything -- that he was getting drugs easier

8             there and I guess when he couldn't get it, he

9             will find a way to go get it and then go back

10           there and that was like -- his life was upside

11           down like, you know, and I find -- I find this

12           out, you know, as time went on. When he first

13           went there, I can see he was getting his life

14           together but as time started to -- all of us

15           started to unravel everything of why he stayed

16           away and why he was there and things like that

17           and it all makes sense now.

18    Q.    Did you ever send Mr. Rhodes money?

19    A.    More than likely, probably, but more -- like a

20           lot of time I sent it to his mom and that's what

21           I've been doing. Even like now that he's in

22           prison I cash up his mom or something and then I

23           tell her to send it, and like even like we put a

24           call in or anything, I pay for that every -- you

25           know, I pay for that every month so he can call

1    home on a discounted rate.  I do that for him.

2    You know, like I said, me and him was very close

3    and I've been doing that for, you know, forever

4    because he been -- it seem like forever since he

5    been in there.

6  Q.  And when he would come and visit in Milwaukee,

7    did you see him?

8  A.  Yeah.  Yeah, I seen him and -- you know, and he

9    started to look not like himself, you know,

10    because, you know, I seen him rarely like --

11    there been times -- go a year or so without --

12    you know, I talk to him and then you see him,

13    it's like he don't even look the same anymore,

14    you know, and he was like -- when he came to

15    Dubuque, I remember one time he came and visited

16    and he just looked like -- like he was a freshman

17    in high school.  It just like, "Man, what's going

18    on with you, man?"  It was, you know, shameful.

19    I think he stayed away, you know, like stayed in

20    Iowa so he looked normal there and nobody knew

21    him, but I think he was just here like to be by

22    his family.  It's like, "Dude, what's going on?

23    What's wrong with you?  Are you sick," you know,

24    so I think like Iowa was just a better -- a new

25    start for him to a certain extent and I think

1      that's why he stayed away.

2  Q.   Okay.  Would he come and visit your grandma when

3       he would go back to Milwaukee?

4  A.   Absolutely.  I don't think he would not stop and

5       see my grandmother, you know.  Like that's her

6       baby.  That's her -- she would want to see him

7       any time he came.  Like now she's in a nursing

8       home.  If she seen him right now today, you know,

9       it would just melt her heart, you know, so -- can

10      see him not -- I don't -- but I can't speak for

11      their relationship.  This is my understanding of

12      it, you know.

13 Q.   Okay.

14 A.   This is my understanding of it, yeah.

15 Q.   All right.  Do you think your grandma would have

16      hid the fact that Mr. Rhodes was living with her

17      from you?

18           MS. CHAPIN:  Objection, speculation.

19 A.   No, she had no reason to.  There's nothing --

20      there's nothing like -- she's not -- she won't be

21      ashamed of saying, "Hey, Dante, live with me," or

22      she wouldn't be ashamed of not -- because she

23      loves my cousin.  Like why -- like she's not --

24      my grandmother, for one is not a liar and for

25      two, she's not -- she's like -- like I say, I'll

1    stop down there to fix stuff down there and she

2    will be like, "Hey, Dante" -- Dante, hide him

3    from me, no, absolutely not.

4  Q.   Okay.

5  A.   No, no.  Like we was -- I go down there.  I talk

6       to her about -- like I say, when I go see her

7       now, talk to her about Dante, you know, and even

8       though she might got dementia, I still talk to

9       her about it.  That was never like a secret --

10      don't have to secretly hide him from us.  That

11      would have been -- no.

12            MR. HOOVER:  Okay, and just for the

13      record again, the State objected to speculation

14      and the judge will rule on it at the time.

15 A.   Okay.

16            MR. HOOVER:  Hold on a minute.  I'm just

17      going to make sure that there's no questions

18      Dante wants me to ask.

19            (Mr. Hoover is speaking to the Plaintiff

20      on his cell phone.)

21            MR. HOOVER:  That's all the questions I

22      have for you.  The County Attorney is going to

23      have a couple questions for you.

24 EXAMINATION BY MS. CHAPIN:

25 Q.   Good morning, Mr. Cooper.  My name is --

1   A.   Good morning.

2   Q.   My name is Shea Chapin and I just have a few

3        questions for you; okay?

4   A.   Okay.

5   Q.   It's my understanding, sir, that you and

6        Mr. Rhodes are really close.

7   A.   Yes.

8   Q.   Okay.  Like brothers?

9   A.   Yes.

10   Q.   And is it correct for me to understand then that

11        you actually never came to Iowa to visit

12        Mr. Rhodes in Dubuque?

13   A.   Never, never.

14   Q.   And you never came to Ottumwa to see Mr. Rhodes

15        either?

16   A.   Never.  The only time I came to Iowa was to the

17        court date the last time I showed up and that was

18        it.

19   Q.   Okay.  I believe I actually met you here that

20        day, Mr. Cooper, so it's nice to talk to you

21        again.  In April of 2014 when Mr. Rhodes was

22        arrested, he made statements that he had likely

23        lost his job in Milwaukee.  Do you know where he

24        would have been working in Milwaukee in 2014?

25   A.   No, I'm not -- trying to ponder but no.

1    Q.    Okay.

2    A.    Not off the top of my head, no.

3    Q.    If he had a job in Milwaukee, would you be aware

4         of that?

5    A.    I don't even remember Dante having a job.

6    Q.    Okay.

7              MS. CHAPIN:  Thank you.  Nothing

8    further, sir.

9    A.    Not that I can remember.

10           MR. HOOVER:  I don't have any further

11    questions for you either.

12           MS. CHAPIN:  Thank you so much,

13    Mr. Cooper.

14           MR. HOOVER:  Have a good day.

15           THE WITNESS:  All done?

16           MS. CHAPIN:  Yeah.  Thank you.

17           MR. HOOVER:  Thank you.

18           (The deposition was concluded at

19    11:45 a.m.)

20

21

22

23

24

25

1             CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Dixie Shelton, a Certified Shorthand Reporter
in and for the States of Iowa and Illinois, do certify
that, pursuant to the agreement herein contained, this

4   deponent came before me at the aforementioned time and
place, who was sworn by me to testify to the truth and

5   nothing but the truth concerning the matters in
controversy in this cause; that the deponent was

6   thereupon examined under oath and the examination was
reduced to writing by me, and the printed transcript is a

7   true record of the testimony given by said deponent and
all objections made.

8

9          I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken,

10  and, further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or

11  financially interested in the action.

12         In witness whereof I have hereunto set my
hand this 16th day of March, 2020.

13

14

15                    *Dixie Shelton*
                    ─────────────────────────
16                    Dixie Shelton
                    Certified Shorthand Reporter
17                    IA License No. 600
                    IL License No. 084-003341
18                    P.O. Box 222
                    Stockton, Illinois 61085

19

20

21

22

23

24

25

DEPOSITION C.

DANTE KWAN RHODES, DEFENDANT

1          IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

2    DANTE KWAN RHODES,            )
                                   )
3              Plaintiff,          )
                                   )    Case No. 01311 PCCV107576
4    vs.                           )
                                   )    TELEPHONE DEPOSITION
5    STATE OF IOWA,                )          OF
                                   )    DANTE KWAN RHODES
6              Defendant.          )

7

8

9    APPEARANCES:    ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
                     P.L.L.C., 110 West Main Street, P.O. Box
10                    306, Epworth, Iowa 52045, appeared on
                     behalf of the Plaintiff.
11
                     ASSISTANT COUNTY ATTORNEY SHEA M. CHAPIN,
12                    Dubuque County Attorney's Office, Dubuque
                     County Courthouse, 720 Central Avenue,
13                    Dubuque, Iowa 52001, appeared on behalf
                     of the Defendant.
14
     On cell phone:  Dante Kwan Rhodes, Plaintiff
15

16

17          Telephone Deposition of DANTE KWAN RHODES,

18   taken in the 3rd Floor South Courtroom, Dubuque County

19   Courthouse, 720 Central Avenue, Dubuque, Iowa, on

20   March 6, 2020, commencing at 9:49 o'clock a.m., before

21   Dixie Shelton, a Certified Shorthand Reporter in and

22   for the States of Iowa and Illinois, in the

23   above-entitled matter.

24

25

INDEX

WITNESS                                    EXAMINATION

Dante Kwan Rhodes    (Mr. Hoover)              3

                     (Ms. Chapin)             45

                     (Mr. Hoover)             53


                        EXHIBITS

   Exhibit                                   Offered

Petitioner's Exhibit 1                         15

Petitioner's Exhibit 2                         15

Petitioner's Exhibit 3                         17

Petitioner's Exhibit 4                         19

Petitioner's Exhibit 5                         20

Petitioner's Exhibit 6                         21

Petitioner's Exhibit 7                         22

State's Exhibits A, B, C & D                   44




Certificate of Shorthand Reporter             55

1                    DANTE KWAN RHODES,

2     being first duly sworn, was examined and testified as

3     follows:

4     EXAMINATION BY MR. HOOVER:

5     Q.    Okay.  Mr. Rhodes, can you state and spell your

6           name for the record?

7     A.    Dante Rhodes, D-a-n-t-e R-h-o-d-e-s.

8     Q.    Okay.  And, Mr. Rhodes, where are you currently

9           residing?

10    A.    I'm currently at Lee County United States Prison.

11    Q.    Okay, and is that a maximum security prison?

12    A.    Yes, sir.

13    Q.    And how long have you been there?

14    A.    Roughly June or July, sir.

15    Q.    And where were you before going to federal

16          prison?

17    A.    I was in Anamosa State Prison.

18    Q.    Okay, and was that for these charges that we're

19          currently doing a PCR on?

20    A.    Correct.

21    Q.    Okay.  Did you discharge that sentence or have

22          you since -- or are you considered to be on

23          parole?

24    A.    I'm considered to be on parole.

25    Q.    Okay.  Do you know how long -- how much longer

1      you have on that sentence?

2  A.  I believe it's -- I was sentenced to ten years

3      and I think they said four years and ten months

4      is the discharge date so I think it's '23 or '24,

5      sir.

6  Q.  Okay, and does this -- do these charges have a

7      significant effect on your federal prison stay?

8  A.  Yes.

9  Q.  And how is that?

10 A.  Because this charge entails me to be considered a

11     career criminal so it enhanced my position on the

12     guidelines significantly.

13 Q.  Okay.  Is that why you're in maximum security?

14 A.  Yes, that's one of the reasons.

15 Q.  Okay.  Now, Mr. Rhodes, at some point were you

16     living in Dubuque, Iowa?

17 A.  Yes.

18 Q.  And do you recall the years that you were living

19     in Dubuque, Iowa?

20 A.  Yes.  I was -- the first time I came to Dubuque

21     was 2008.  2009 I began living in Dubuque, Iowa.

22 Q.  Okay.  What brought you to Iowa?

23 A.  A relationship that I had with a lady by the name

24     of Tiffany Jackson.

25 Q.  When you were living in Iowa, who did you

1      primarily reside with?

2  A.  A gentleman by the name of Ken Haugen.

3  Q.  Did you and Tiffany also have your own residence

4      at times?

5  A.  Yes, sir.

6  Q.  Okay, and I guess did you have some issues while

7      you were living in Iowa?

8  A.  Yes, I was -- I was chemically dependent so I was

9      pretty much in a bad way on drugs.

10 Q.  Okay, and what was your drug of choice?

11 A.  Actually my drug of choice was pain pills.

12     However, it kind of spiraled into heroin when I

13     was unable to get ahold of them, the pain pills.

14 Q.  And how -- I guess what years were you using

15     heroin?

16 A.  2000 -- I'll say 2010, 2009, 2010 subsequently

17     all the way up until I was arrested.

18 Q.  And when you say arrested, arrested for what?

19 A.  This last charge that I'm incarcerated for in the

20     federal prison, bank robbery.

21 Q.  Okay.  Would it be fair to say you had a number

22     of criminal charges in Iowa?

23 A.  Yes.

24 Q.  Okay, including this charge that was from 2010;

25     is that correct?

1   A.   Yes.

2   Q.   And subsequently did you get charged for

3        additional crimes in Dubuque, Iowa?

4   A.   Just possession.

5   Q.   Okay, and what was that -- what were you

6        possessing at that time?

7   A.   Cocaine and heroin.

8   Q.   Okay. Now, at some point after you got the

9        possession for cocaine and heroin did you leave

10        Dubuque?

11  A.   I ended up going to Ottumwa because Tiffany ended

12       up getting employment at a club down there and we

13       got a house down there so I ended up moving to

14       Ottumwa so she could be -- she was like a couple

15       blocks down from where she was working.

16  Q.   Okay, and what was the name of the place she was

17       working?

18  A.   Chills and Thrills. I remember the -- her boss

19       was a lady by the name of Leslie that owned the

20       place.

21  Q.   Okay, and how long were you residing in Ottumwa?

22  A.   About two years.

23  Q.   Okay. Do you recall about when you went to

24       Ottumwa?

25  A.   Yeah, it was about the end of 2000 and -- 2012

1     and I say about eighteen months because it was

2     2012 that we initially ended up going up there

3     and staying and I kind of fell upon hard times

4     about 2014 and that's when I remember I was no

5     longer in Ottumwa.

6   Q.   Okay. When you left Ottumwa where did you go?

7   A.   Then I go back to Dubuque. I mean, Ken was kind

8     of like a godfather to me. He was a real good

9     guy, may he rest in peace, so I would be around

10    Ken a lot in Dubuque when I was there, and I also

11    have -- my son and my grandmother were pretty

12    close so I would go -- I would always visit them

13    because it was not too far from Dubuque.

14   Q.   Okay, and when you say your son and your

15    grandmother, where did they reside?

16   A.   In Milwaukee.

17   Q.   Okay. Now, were you aware that on your arrest

18    warrant for these current charges they listed

19    your place of residence as Milwaukee?

20   A.   I can imagine that they -- I can imagine that

21    happening because that was the address that was

22    on my -- my driver's license.

23   Q.   Okay. During the time between 2010 and 2014 was

24    there any time that you were living with your

25    grandmother at that address?

1    A.    No.

2    Q.    What about any other family members in Milwaukee?

3    A.    No. The only -- I have a lot of family in

4        Milwaukee but no one that I would live with so

5        that's definite -- that's definitely no.

6    Q.    Okay. Why wouldn't you live with family?

7    A.    I will say I'm kind of particular of who I'm

8        around as far as living. Me and my family are

9        not close where I would even consider that an

10       option of living with them.

11    Q.    What about your grandmother?

12    A.    Yes, that's my heart. However, my family had

13       bushwhacked me with an intervention in 2012 and

14       the ultimatum from that intervention was that I

15       had -- I couldn't stay with anybody. Basically

16       my family was in my best interests giving me an

17       ultimatum that I couldn't be around them unless I

18       was -- unless I got off of drugs, so that wasn't

19       an option.

20    Q.    Okay, and why was that not an option?

21    A.    Because they -- I had to get clean first.

22    Q.    Okay, and why not just get clean?

23    A.    Actually I tried with numerous -- there was

24       numerous attempts. When the intervention

25       happened, I went into treatment then. However,

1    the withdrawals was too bad and I would relapse

2    and go back to Iowa again. Tiffany was kind of

3    enabling me for lack of a better word. They were

4    all -- she was actually mad when my family --

5    bushwhacking me with an intervention and I wanted

6    to get help. It was just -- it was tough. It

7    was tough.

8  Q.  Did you move all your belongings to wherever you

9    were getting treatment?

10  A.  No, my belongings always stayed -- they stayed

11    with wherever I was living, I mean in -- either

12    on Rosemont or in Ottumwa. Whenever I moved,

13    whenever I went to like treatment or something,

14    it was just pretty much the clothes I had on my

15    back. My mom would always pack clothes and stuff

16    and bring them to the treatment place, which I

17    was only there a couple weeks. I found a reason

18    to go back to Iowa.

19  Q.  Okay. While you were living in those facilities

20    did you consider that your residence?

21  A.  Of course not. I was only there two and three

22    weeks at a time and by the two or three weeks the

23    withdrawals will get so excruciating I would

24    always relapse.

25  Q.  Okay. What did you consider your place of

1          residence during the times that you were getting

2          treatment?

3     A.   Iowa because I never -- I never left there. All

4          my furniture, all my clothes and stuff,

5          everything that I owned was pretty much with

6          Tiffany. I was -- home was pretty much with

7          Tiffany around those times.

8     Q.   Have you or anybody tried reaching out to

9          Tiffany?

10    A.   Of course. My son said he seen her and he talked

11         to her on the phone and after he told her -- and

12         I believe it's because she's, you know, living

13         that life, she don't want to end up in a

14         courtroom. She probably don't know what type of

15         warrant she might have or whatever the case may

16         be, but she responded saying that she -- that she

17         would help me and to tell me that she still loved

18         me but she stopped answering the phone, and then

19         my son tried to put a request to her son after

20         numerous attempts to reach her and her son hasn't

21         responded either.

22    Q.   Okay, and at any of this time were you aware of

23         where she was actually living?

24    A.   Any of what times, sir?

25    Q.   That your son reached out to her.

```
 1   A.   My son seen her in Milwaukee.  Her mom -- that
 2        was like pretty much ultimately the reason that
 3        we ended up back in Milwaukee around 2014 was
 4        because her mom died and she's been kind of being
 5        around her son because her mom was taking care of
 6        her son, as my grandma was doing with mine, so
 7        she kind of filled that void and been pretty much
 8        in Milwaukee since about '14.
 9   Q.   Okay.
10   A.   However, I'm pretty sure she still dances and
11        goes and makes money but her headquarters is in
12        Milwaukee now.
13   Q.   Okay, and did you move there with her when she
14        moved to Milwaukee?
15   A.   Actually I was with Ken.  However, like I said,
16        home was pretty much with her so we came back
17        together so, yeah, we were -- if I wasn't with
18        her, I was in Dubuque with Ken.
19   Q.   Okay.  Where did you consider your home during
20        that time?
21   A.   In 2014?
22   Q.   Yes.
23   A.   If I would have to say home, I will have to say
24        it was with Ken because I really -- I wasn't
25        living at Tiffany's mom house and I had too much
```

1    baggage in Milwaukee to pretty much even have a

2    home there really.

3  Q.  Okay.  Were you employed in Milwaukee in 2014?

4  A.  I was doing some -- for Safe Watch Surveillance

5    but that was -- that didn't last long.  That was

6    probably a couple weeks.

7  Q.  Okay.  Is that the employment that you told the

8    Public Defender investigator about?

9  A.  Yes.

10  Q.  Okay.  Do you ever recall talking about Ottumwa

11    with the private -- the Public Defender private

12    investigator?

13  A.  No, because there was no reason to.  It was 2014

14    and he was asking me where -- where was I

15    residing at that time, not where I was residing

16    for the last years.

17  Q.  Okay.  Do you ever recall any attorney ever

18    discussing statute of limitations on a criminal

19    charge?

20  A.  No, and actually during the times of 2010 through

21    2014 my grandma was in great health and I

22    remember I got pulled over on a traffic violation

23    going to visit in 2013 and I was getting close

24    to -- I was coming from Dubuque and I was getting

25    close to Milwaukee and I was kind of going

1       through withdrawal so I began speeding because I

2       was getting close to Milwaukee and I got pulled

3       over and when I got pulled over he -- the officer

4       gave me a ticket for having two driver's licenses

5       and I ended up having to go to court for those

6       cases, which was the case that I ended up

7       going -- ultimately going back and forth, so in

8       November the case was finally closed but my

9       grandma was helping me to make my court dates and

10      she would have been able to produce some evidence

11      at that time to prove where I was living but her

12      health was taking a turn and dementia had set in

13      so she's not competent where I could have

14      easily -- and I was also with Tiffany at that

15      time so I could have easily -- and Ken Haugen was

16      also living so it would have been fairly easy for

17      me to prove where I was at and the truth -- so

18      it's kind of -- kind of bad that I'm going back

19      years on these situations when I would have been

20      able to prove -- prove the truth easily at that

21      time.

22  Q.    Sure, and during the times 2010 to 2014 did you

23      ever receive state assistance?

24  A.    Yes.

25  Q.    And I know you probably don't have the book in

1          front of you, but Petitioner's Exhibit 1 purports

2          to be a Department of Human Services document and

3          the address would have been 1964 Rosemont and the

4          name would be Dante, D-a-n-t-e, Rhondes,

5          R-h-o-n-d-e-s. Do you believe that's a

6          misspelling of your name?

7     A.   Yes, it has to be, and I remember going down

8          there numerous times. That wasn't the only time

9          that I've applied for -- for full share down

10         there because the last time I went I noticed that

11         the place had moved around the corner. It wasn't

12         in the same place that it was the first time I

13         went there.

14    Q.   Okay. Is that maybe the first time that you

15         received -- you actually received assistance?

16    A.   No, I don't -- that's what I'm saying. I

17         believe -- I believe I was receiving assistance

18         also on Center Place and I can't really remember

19         the address.

20    Q.   Okay.

21    A.   Center Place, but I believe I was receiving

22         assistance on Center Place also.

23    Q.   Okay, and at 1964 Rosemont, whose residence would

24         that have been?

25    A.   Ken Haugen.

1  Q.   Okay.

2              MR. HOOVER:   I'm just going to move that

3       Petitioner's Exhibit 1 be admitted.

4              MS. CHAPIN:   No objection.

5  Q.   Okay.   At some point were you employed by Express

6       Services in Dubuque?

7  A.   Yes.

8  Q.   And again, this paycheck has an address of 1964

9       Rosemont Street?

10 A.   Yes.

11 Q.   And would you have been working at Berry Plastics

12      at any point?

13 A.   Yes.   I was dealing with Express numerous over

14      the years.   I also remember working at John

15      Deere   However, it wasn't through John Deere, it

16      was through a cleaning service but it was through

17      Express so, yes, I definitely remember that.

18 Q.   Okay.

19             MR. HOOVER:   I'm going to move for

20      Petitioner's Exhibit 2 to be admitted.

21             MS. CHAPIN:   No objection.

22 Q.   Okay.   Now, what I've marked as Petitioner's

23      Exhibit 3, it's a Financial Affidavit you filled

24      out in 2014.   What happened in April of 2014?

25 A.   April of 2014.   Is it a court case?

1   Q.   Yes.

2   A.   And you're referring to --

3   Q.   In April of 2014 or around that time were you

4        arrested in Wisconsin and held?

5   A.   Oh, yes. I'm not exactly sure exactly what date

6        that was, but I was riding with some people and

7        they were -- they were doing some illegal

8        activity and when we got pulled over, I informed

9        the -- that the guy was driving and I informed

10       the officer that the guy was driving because the

11       guy didn't have a driver's license but I had a

12       driver's license, so the officer told me that he

13       would let me drive and then they ran -- they ran

14       our names and it came back that I had a warrant

15       in Dubuque.

16  Q.   Okay. Were you living with your grandmother at

17       that time?

18  A.   No.

19  Q.   Okay. If it shows on there that -- it says list

20       all money you or anyone else has living in your

21       household, and you put grandma has income, do you

22       know why you would have listed that?

23  A.   That was like my family -- that's been like my

24       family residence so if I list them, more than

25       likely it was because instead of me just putting

1     down home -- it's about a residence in Milwaukee,

2     I will just put down where my family residence

3     will be then.  That's been kind of a residence

4     for me my entire life.

5  Q.  Okay.  If you listed a street address as 1964

6     Rosemont, though, would you have been staying

7     there?

8  A.  Yes, because that's where my clothes and stuff

9     were.

10  Q.  Okay, or maybe you -- were you using at that

11     time?

12  A.  Yes.

13  Q.  Could you have been confused about what the

14     question was?

15  A.  Yes, I was in a -- I was in a bad way during

16     those times so it was kind of a drug-induced fog

17     so I can imagine so.

18  Q.  Okay.

19          MR. HOOVER:  I'm going to ask that

20     Petitioner's Exhibit 3 be admitted.

21          MS. CHAPIN:  No objection.

22  Q.  Okay.  Let's take a look at Petitioner's

23     Exhibit 4.  Again, I understand you probably

24     don't have it right in front of you, but in May

25     of 2010 had you been arrested?

1   A.   In May of 2010 was I arrested you said?

2   Q.   Yes.

3   A.   Yes.

4   Q.   And would that have been the possession?

5   A.   Yes.

6   Q.   Okay, and you list an address of 925 Nevada,

7        Apartment 1, in Dubuque.

8   A.   I don't even remember listing that.  That's the

9        address that the incident happened at.

10  Q.   Okay.  Were you staying there --

11  A.   1122.  I was living at 1122 Center Place.

12  Q.   Okay.

13  A.   That's where I was living and that was a female

14       friend that I was diddling with and that's where

15       the incident happened at.

16  Q.   Okay.

17  A.   I don't even know -- there's nothing that would

18       link me to that address, link me to that address

19       except for that's where I was arrested.

20  Q.   Okay, but you would have been living in Dubuque

21       in May of 2010; correct?

22  A.   Yes.

23  Q.   Okay, and that at least is an address here in

24       Dubuque that would have happened after the

25       incident involving the accusation that you sold

1        heroin; correct?

2    A.    Correct.

3    Q.    Okay, and then in June of 2000 -- sorry.

4              MR. HOOVER:   I'd ask that Petitioner's

5         Exhibit 4 be admitted.

6              MS. CHAPIN:   No objection.

7    Q.    Okay.  Now, there's what I've marked as

8         Petitioner Exhibit 5, which is a list from Iowa

9         Courts Online of addresses associated with you.

10   A.    What was that?

11   Q.    If it shows that between May 16, 2010, and May

12        21st of 2010 that you were residing at 1122

13        Center Place, Apartment 5, would that be

14        accurate?

15   A.    Yes.

16   Q.    Okay, and then if it lists that 925 Nevada,

17        Apartment No. 1 in Dubuque -- that you were

18        residing there between May 21st, 2010, and June

19        2nd, 2010, would that be accurate?

20   A.    No, because how would I be -- how would I be

21        residing someplace when it sounds like ten or

22        eleven days?

23   Q.    Okay.  What about if it shows from June 2nd,

24        2010, till December 6th of 2010 that you were

25        residing at 1122 Center Place, Apartment 5 in

1          Dubuque, Iowa, would that be accurate?

2   A.     I don't think that would be accurate because I

3          was -- I was having problems with Wade so I

4          remember I went to Center Place, I mean I went to

5          Rosemont in 2010 but I can't remember exactly

6          what month.

7   Q.     Okay, so if it shows that you were from

8          December 6th, 2010, to June 5th of 2014, that you

9          were living in that Milwaukee address, would that

10         be accurate?

11  A.     Not at all.

12  Q.     And is that the time frame where you were saying

13         that you were either living at Rosemont or

14         Ottumwa?

15  A.     I would guess -- if I was living in Ottumwa, I

16         told you it was probably 2012 to 2014, beginning

17         of 2014, but I was back and forth from Rosemont

18         to Ottumwa during 2010-2014.

19  Q.     Okay. Would you -- was there times that you

20         would leave Ottumwa and come back to Dubuque to

21         live?

22  A.     I would say -- well, not necessarily to live,

23         just to stay with Ken.

24  Q.     Okay.

25                 MR. HOOVER:  And I'd just ask

1      Petitioner's Exhibit 5 be admitted.

2                  MS. CHAPIN:  No objection.

3  Q.  All right.  In Petitioner's Exhibit 6, in April

4      of 2010 do you recall a search warrant being

5      served upon you?

6  A.  Yes.

7  Q.  And if it listed your address at that time as

8      1122 Center Place, Apartment 5 in Dubuque, Iowa,

9      would that be accurate?

10 A.  Yes.

11 Q.  Okay.

12                 MR. HOOVER:  Ask that Petitioner's

13     Exhibit 6 be admitted.

14                 MS. CHAPIN:  No objection.

15 Q.  And then was another warrant served upon you

16     about April 22nd of 2010 or around that time

17     frame?

18 A.  Correct.

19 Q.  And if it listed your place of residence at 1122

20     Center Place, Apartment 5 in Dubuque, Iowa, would

21     that be accurate?

22 A.  Yes.

23 Q.  Okay, and so Petitioner's Exhibit 7 would have

24     happened after Petitioner's Exhibit 6; is that

25     correct?

1   A.   Correct.

2   Q.   And so at that time they knew your address to be

3        Center Place, Apartment 5; is that correct?

4   A.   Correct.

5   Q.   Okay.

6             MR. HOOVER:   I ask that Petitioner's

7        Exhibit 7 be admitted.

8             MS. CHAPIN:   No objection.

9   Q.   At any point in any of your interactions with the

10       court or with police, did you ever give them the

11       Milwaukee address?

12  A.   No.

13  Q.   All right.

14  A.   I could see them -- the only way they would have

15       the Milwaukee address, it was on my driver's

16       license.

17  Q.   Okay.   Now I want to talk specifically about who

18       was representing you on these -- on the charges

19       in the two delivery of heroin cases.

20  A.   Scott Nelson.

21  Q.   Okay.   Did you talk to any other attorney about

22       this case?

23  A.   About this case, no.

24  Q.   Okay.   Scott Nelson was the only attorney that

25       you met with?

1  A.  Correct.

2  Q.  How many times would you say -- I guess first of

3       all were you ever released from custody once you

4       were arrested in Wisconsin?

5  A.  Once I was -- yes.

6  Q.  Okay, and maybe I better make it clear.  When you

7       were arrested in Wisconsin for the warrant here

8       in Dubuque, were you ever released from custody

9       during this case?

10 A.  Yes, I was released.  After that I was extradited

11      back to Dubuque.  I was released.

12 Q.  Okay.  Did you end up -- did you end up going

13      back to jail at some point?

14 A.  Yes.

15 Q.  Okay.  Do you recall why you went back to jail?

16 A.  It depends which case you are talking about

17      because I was released from -- I was released

18      back to Rosemont 2014 -- is that what you talking

19      about?

20 Q.  Yeah.  Now, when you ultimately pled guilty to

21      the two counts of possession with intent of

22      heroin, were you in jail or were you out of

23      custody?

24 A.  No, I was in jail.

25 Q.  Okay.  How did you end up back in jail?

1   A.   I went to try to get -- no, not tried.  I went

2        and got in treatment again and I was arrested in

3        October of 2000 -- I remember it was -- no, it

4        was the day before October.  See, it was

5        September of 2016 because my grandma had a

6        birthday, an eightieth birthday, and I was in

7        jail for it.

8   Q.   Okay.

9   A.   So I remember vividly that that was the time that

10       I was arrested.

11  Q.   How many times during Scott Nelson representing

12       you did you actually see him?

13  A.   Just at sentencing.  That's it.

14  Q.   What about during the plea?  Did you meet with

15       him then?

16  A.   During the plea.  Oh, yes.  I'm sorry.  During

17       the plea is when I seen him.

18  Q.   Okay.

19  A.   Yeah.

20  Q.   Did he talk to you and discuss the plea deal with

21       you prior to the plea?

22  A.   Yes.  I was asking him -- I was adamant about

23       asking him to let me see my motion of discovery

24       and Minutes of Testimony and he never produced

25       any of these things.  He basically had a

1         belligerent disposition with me, said he wasn't a

2         secretary. I explained to him I don't want to go

3         into trial like Stevie Wonder and he laughed and

4         said I should want to be like Stevie Wonder, he

5         has money. He never came and seen me and he

6         never produce -- I told him that I wanted

7         deposition and I even wrote to the judge

8         requesting deposition and he never -- he asked me

9         who do I want to depose and never gave me

10        deposition, and I was kind of going through

11        withdrawals and I was tired of being incarcerated

12        and he told me that he could -- he could get me

13        out if I -- if I pled guilty, he would get me a

14        suspended sentence.

15    Q.    Okay.

16    A.    So that's what ultimately was offered.

17    Q.    At any time did he ask where you were living or

18        staying between 2010 and 2014?

19    A.    No.

20    Q.    Did you guys have any discussions whatsoever

21        about a statute of limitations?

22    A.    No.

23    Q.    Go ahead.

24    A.    I wonder because I remember asking him -- I

25        remember vividly asking him what -- what was I

1      being locked up for, what evidence did they have

2      against me over the phone and he -- it was like

3      he -- he was opening my file and reading it in

4      front of me and that's when I was telling him --

5      I was asking him would he send me my motion of

6      discovery and he never produced it to me so I was

7      never able to see it and, no, he never discussed

8      any of that with me.

9  Q.   Okay. Did he ever discuss -- or what did he

10     discuss with you as far as your options as far as

11     trial or any plea offers?

12  A.   I asked him how could I end up in prison

13     because -- how could I end up in prison and I

14     didn't even do -- actually do what they're saying

15     that I did, and he told me that it happens all

16     the time. It was a pretty rough situation and I

17     can admit that I was exploitable at that time due

18     to my drug abuse.

19  Q.   Okay. Did you guys ever discuss anything as far

20     as that you wanted him just to get you out of

21     there, it didn't matter what?

22  A.   No. He was telling my family that I was going to

23     prison like because of my criminal record and I

24     just find it ironic he never gave me my files.

25     All he was talking about was prison, you know.

1    Q.    Okay. Did he discuss the strengths and

2           weaknesses of your case?

3    A.    No, never.

4    Q.    What do you recall your conversation with him

5           being?

6    A.    I recall him telling me that he could get me --

7           he could get me a suspended sentence and I will

8           be getting out.  However, this was -- I went

9           into the -- I was incarcerated September 31st and

10        this was like January that he finally told me

11        this so, you know, I was sitting in there all

12        that time and the withdrawals and the lack of

13        confidence in myself basically having to take

14        that plea.

15    Q.    Okay.

16    A.    And I didn't even plead guilty.  I pled no

17        contest because I remained -- I retained my

18        innocence of my situation and I was planning on

19        filing an appeal on it anyway.

20    Q.    Okay.  Did you ever tell Scott Nelson directly

21        that you wanted depositions?

22    A.    Yes.

23    Q.    And what was his response?

24    A.    Who do you want to depose?

25    Q.    Did he ever mention who the witnesses would be

1           that would testify against you at trial?

2   A.   When he asked me who do I want to depose, I told

3           him the people that are lying on me is who I want

4           to depose and it never happened.

5   Q.   Okay, and is that because -- strike that.

6           Eventually did you accept a plea deal?

7   A.   Yes.

8   Q.   Okay.  Do you recall how close to trial it was

9           that you accepted the plea deal?

10  A.   I know it was February 22nd.  I think -- I'm

11          pretty sure that was the date, I mean January

12          22nd, because he postponed my court date and I

13          was a little distraught because I was -- I was

14          feeling like the ninety days should have --

15          should have been up and he postponed the court

16          date and I took the plea.  I pled Alford plea.

17          I'm pretty sure it was January 22nd and I still

18          didn't get out until like February 6th, something

19          like that.

20  Q.   Okay, and you got out pending sentencing; is that

21          correct?

22  A.   Correct.  I was in the halfway house.  I got out

23          to go to the halfway -- they let me out to go to

24          the halfway house planning sentence.

25  Q.   Okay.

1   A.   Or awaiting sentencing.  I'm sorry.

2   Q.   Okay.

3            MR. HOOVER:  I guess at this time I'm

4   going to ask the Court to take judicial notice of

5   the electronic filing, our file for FECR093623.

6   Do you have any objection?

7            MS. CHAPIN:  I'm sorry.  No objection.

8   Q.   Okay.  Get back to -- did you ever have any

9   discussion about whether or not Mr. Nelson would

10  file a Motion to Suppress?

11  A.   No.

12  Q.   At that time did you ever have an opportunity to

13  read through any police reports or the Minutes of

14  Testimony?

15  A.   No.  I told you I asked him several times to

16  produce that so that I could look it over and he

17  never gave it to me.

18  Q.   Okay.

19  A.   Told me he wasn't a secretary.

20  Q.   Okay.  At some point did you find out what the

21  actual evidence was against you?

22  A.   He told me over the phone.  No, he told me over

23  the phone that Andrew Beeler said that he got

24  some drugs from me.

25  Q.   Okay.  Is that true?

1   A.   No, and I responded to him that he's lying. How

2         can I go to prison over someone just saying that

3         to me, over someone just saying that about me,

4         and he told me that it happens all the time.

5   Q.   Okay.

6   A.   And no, it wasn't true.

7   Q.   What about when they executed the search warrant?

8         Were you aware that they found some heroin on

9         someone else who was in the residence?

10   A.   Actually they separated -- they separated us and

11        they took her to jail. No, I wasn't aware that

12        they found anything on her.

13   Q.   Okay.

14   A.   They took her to jail. They never -- they never

15        took me to jail or anything so I didn't even know

16        anything about no warrant or nothing.

17   Q.   Okay. Did you sell her heroin?

18   A.   No.

19   Q.   Do you know why she would have had heroin in her

20        purse?

21   A.   I mean, she was -- she was a user also so that's

22        why she would have had it. That makes all the

23        sense in the world to me.

24   Q.   Had you used with her before?

25   A.   Yes.

1    Q.   Okay.  When you used with her, who provided the

2         heroin?

3    A.   She did or whoever had it, you know, whoever had

4         it.

5    Q.   And at that time you were actually using heroin;

6         correct?

7    A.   Correct.

8    Q.   Would you have given all the heroin you had to

9         her?

10   A.   No, of course not.

11   Q.   Why not?

12   A.   I mean, that's the main reason for using heroin

13        is just to not be in withdrawal so why would I

14        give her the heroin and then I'm in position

15        where I'm going through withdrawals?

16   Q.   Well, if she bought it from you, couldn't you

17        have just purchased more?

18   A.   Unfortunately when you're in that state of mind,

19        that means more than money because who wants to

20        go to the flew {sic} times twenty, so you

21        wouldn't give up all that to no one else for no

22        amount of money.

23   Q.   Did they find any heroin in your apartment other

24        than the person's purse?

25   A.   No.  I'm sure they would have taken me to jail.

1    Q.   Did they take -- did they take money that you had

2         at the apartment when they were executing the

3         search warrant?

4    A.   Yes, and they asked me where did I get the money

5         from and I told them because Tiffany was sending

6         me money from Burlington.  She was in Burlington

7         at that time and I had the money -- I had the

8         receipts that she had -- that she had sent that

9         money to me and they took them so they know that

10        I have receipts.

11   Q.   Did you deny -- did you deny that the money was

12        yours initially?

13   A.   I mean, the money initially -- it really wasn't

14        mine.  It was me and Tiffany's money.  It was

15        actually our rent money so I'm sure I did deny it

16        initially.

17   Q.   And then did you later tell them that you had a

18        job?

19   A.   Yes.

20   Q.   Okay.  Do you have anybody who could testify that

21        you definitely did not sell the drugs to either

22        Andrew or the person who was in the apartment

23        during the search warrant?

24   A.   I mean, there was no one else there that could --

25        that could testify to that.

1   Q.   To your knowledge, has either one of them told

2        you or any of your family members that they told

3        the police a lie?

4   A.   I haven't been -- I haven't been in contact with

5        either of them so --

6   Q.   Okay, and in what ways do you feel that Scott

7        Nelson was ineffective?

8   A.   I believe he was ineffective because he never put

9        those -- he never put those, the motion of

10       discovery and the Minutes of Testimony so that I

11       could even review the cases that they had against

12       me. He never mentioned to me about the statute

13       of limitations. Since I was actually living

14       there, that definitely would have been paramount

15       at that time and it would have been easy for me

16       to prove those things and he basically -- he

17       never came to see me. The only time I seen him

18       was when I was taking the plea, you know.

19   Q.   Okay.

20   A.   He had a belligerent disposition with me the

21       whole time. He didn't suppress any evidence.

22       After I ended up in prison and was going -- and

23       finally got a chance to go on to study the law a

24       little bit, I realized that he knew that I

25       believed there wasn't even any solid evidence

1    against me. There was nothing to corroborate the

2    testimony and he didn't even mention that to me,

3    you know. There's a pleather of things he could

4    have done to help me and he didn't even mention

5    any.

6  Q.  Okay. Did he discuss with you any steps he took

7      in investigating the case?

8  A.  No.

9  Q.  Did he -- did he ever tell you that he was -- he

10     had talked to the people who were accusing you of

11     selling them heroin?

12 A.  No, definitely not. I sent a -- I sent a letter

13     to the judge asking because he wasn't -- he

14     stopped responding to my phone. He stopped

15     answering my phone calls. I sent a letter to the

16     judge requesting deposition --

17 Q.  Okay.

18 A.  -- so that I could -- so that I could try, you

19     know, bring to light that they were lying on me

20     and it just never happened.

21 Q.  Okay. Did he explain to you your rights, your

22     trial rights?

23 A.  No.

24 Q.  Did the judge explain to you your trial rights

25     before entering the plea?

1    A.    Yes.  However, I was -- I pled no con -- I pled

2          the Alford plea because I planned on appealing

3          the case but I knew that I didn't have a chance

4          with Scott Nelson so that was my motivation to

5          try to get out, because I knew if I wouldn't have

6          taken my plea, I would have just ended up in jail

7          longer.

8    Q.    Okay, and what happened with your -- what

9          happened with your plea?  I apologize.  What

10         happened with your appeal?

11    A.    That's what I'm on now, sir.

12    Q.    You're saying you planned on filing a

13         post-conviction relief?

14    A.    Oh, no.  When I ended up filing an appeal, the

15         judge said that it was past the forty-five days

16         or something.

17    Q.    Okay.  It was past the thirty days?

18    A.    Yes.

19    Q.    Okay.  Did you request that Scott make any other

20         kind of plea offer to the County Attorney?

21    A.    No, I wasn't planning -- I felt that trial would

22         have been the ideal thing but the way that he

23         had -- the way that he was responding to me like

24         melancholy made me feel that I -- he wasn't going

25         to fight for me at trial so I didn't have a

SHELTON REPORTING (815) 947-3141

1      chance.

2   Q.  Okay. Now, so I just want to make sure that

3      we've covered all the claims that you're making.

4      One claim you're making, you're asking the Court

5      to decide is whether or not Scott Nelson was

6      ineffective for failing to file a Motion to

7      Suppress based on the statute of limitations; is

8      that correct?

9   A.  Correct.

10  Q.  Okay.

11  A.  That's one of them.

12  Q.  And would it also be that he failed to even

13     investigate as to whether or not the statute of

14     limitations had been violated?

15  A.  Correct.

16  Q.  Okay. Is another argument that you're asking the

17     Court to decide is whether or not Scott Nelson

18     was ineffective for failing to file a Motion to

19     Dismiss based on the failure -- that the warrant

20     didn't produce probable cause to -- or probable

21     cause to believe that there would be criminal

22     activity found in your residence?

23  A.  Correct, because there wasn't any marked money,

24     there wasn't any court testimony, it was just

25     Andrew Beeler saying that, and when I was trying

1     to locate him I found out he was in jail, so

2     there was no way that I could get in touch with

3     him.

4  Q.   Okay. Do you believe -- are you also asking the

5     Court to decide whether or not the four year

6     delay in your prosecution hindered your ability

7     to produce a defense?

8  A.   Definitely.

9  Q.   Okay, and are you asking him to find that your

10    due process rights were violated by allowing --

11    allowing the prosecution to take place so long

12    after the incident?

13  A.  Definitely, because I don't understand why I

14    wasn't taken into custody when the situation

15    happened and also they never -- they never came

16    to my residence, and if they would have at least

17    came to my residence, at least I would have

18    known, so I couldn't -- I didn't even know

19    anything about it.

20  Q.  Okay. Are you also -- as a pro se claim, are you

21    claiming that Scott Nelson failed to fully

22    investigate the case?

23  A.  Definitely, because I feel like if he would have

24    investigated it, he would have at least seen that

25    there was no evidence against me.

1    Q.    What do you believe would have changed if he

2          would have filed that or investigated your Motion

3          to Dismiss based on being past the statute of

4          limitations?

5    A.    I believe that the case would have been dismissed

6          because I was actually living in Iowa during

7          those times.

8    Q.    Okay.

9    A.    So it's not my fault that they chose to not

10         prosecute me for four years.  I wondered -- I

11         think I remember telling you that when I was

12         arrested -- no, I wasn't even arrested.  When I

13         was pulled over for the speeding ticket in 2013,

14         why didn't it pop up then?  Then I was going to

15         court about the two driver's licenses in November

16         when I got -- finally got the case closed.  I was

17         in court at that time also.  Why didn't the case

18         pull up then?  It wasn't on me.  I didn't do

19         anything wrong --

20   Q.    Okay.

21   A.    -- as far as that goes, as far as the statute of

22         limitations, so I think it definitely would have

23         changed the situation.

24   Q.    And I know you testified a little bit about this.

25         What would have changed or what evidence do you

1    believe was lost because it took them nearly four

2    years to file a Trial Information in this matter?

3  A.  What do you mean by what evidence was lost?  I'm

4    trying to understand.

5  Q.  Yeah.  What evidence do you believe would have

6    been present --

7  A.  Tiffany Jackson definitely, when we were still

8    together at that time, Ken Haugen definitely.  I

9    believe he'd testify for me right now, you know,

10   tell the truth.  I wouldn't ask my family to lie

11   for me nor would they lie for me, but I know that

12   they would tell the truth for me.  I believe Ken

13   Haugen would have also done that and I believe

14   Tiffany Jackson would have also done that at that

15   time while we were together.

16  Q.  Okay.  Do you believe you would have been -- do

17   you believe you would have been able to find

18   further evidence that you were actually living in

19   Iowa?

20  A.  Certainly.  The lady that owned the club, Chills

21   and Thrills, Leslie, the different people that I

22   was associating with during those times, you

23   know, I would have been able to -- I don't have

24   any phone numbers.  Phone numbers was in my cell

25   phone at that time, cell phone records that would

1       have been able to obtain -- but there was all

2       that type of information at that time.

3    Q.  All right, just a few more questions.  In the

4       Waukesha County cases they list your address as

5       2355 North 5th Street in Milwaukee.  Why would

6       they have listed that address if you weren't

7       living there?

8    A.  Okay, and that's Waukesha.  I believe that that's

9       because my -- that was my -- the address that's

10      on my driver's license and the current case that

11      I was going to court for was for having two

12      driver's licenses.

13   Q.  Okay.  With the -- if it shows that they did a

14      filing date on the traffic ticket of 11-13-2013

15      for the two -- more than one license, would that

16      have been after the three years would have

17      passed?

18   A.  I don't know.  However, I know that if they would

19      have done a -- because it was on the -- the

20      traffic incident was on the freeway.  I'm not

21      exactly sure if it would have been after the

22      three -- the three years.

23   Q.  So --

24   A.  But I wasn't -- I wasn't living in Milwaukee

25      anyway.  I was coming from Dubuque, sir.

1    Q.    Okay.

2    A.    And at Waukesha I was probably ten minutes -- I

3          was on my way to Milwaukee and I was probably ten

4          minutes outside of Madison when I was pulled

5          over.

6    Q.    Okay, so if Petitioner's Exhibit 6 shows that

7          Andrew Beeler claimed that you bought the drugs

8          on April 2nd of 2010, would you have any reason

9          to dispute that Andrew Beeler claimed -- claimed

10         to buy it on that day?

11   A.    Yes, definitely.

12   Q.    Well, I'm not asking you whether you sold it to

13         him.  I'm asking would you -- if it shows on that

14         exhibit that in fact he claimed to have bought it

15         on that date, do you have any reason to doubt

16         that he claimed to buy it on that date?

17   A.    No, because I mean Andrew Beeler was in a way bad

18         also.  I can't see him holding on to something

19         that he's using to kill his withdrawals.  I can't

20         see him holding it for a long substantial period

21         of time.

22   Q.    Okay, and if the --

23   A.    Taking it immediately.

24   Q.    If the warrant itself was filed on April 13th,

25         2010, if there's a file stamp on that, would you

1   have any reason to dispute that?

2 A. Yeah. I mean, what do you mean would I have any

3   reason to dispute that? I'm sorry, I'm --

4 Q. Okay. What I'm asking you is if there's a file

5   stamp on the warrant showing April 13, 2010, do

6   you have any reason to dispute that that document

7   was not filed on that date?

8 A. I mean I don't -- no, I don't have any reason to

9   dispute it.

10 Q. Okay. You believe that it would accurately

11   reflect the date it was filed; correct?

12 A. Yes.

13 Q. And if you were -- if the filing date for the

14   traffic ticket was November 13, 2013, would you

15   agree that that would be more than three years

16   after April 13th, 2010?

17 A. Yes.

18 Q. Okay, and again you were detained in Wisconsin

19   about March 3rd, 2014?

20 A. No. I wasn't detained, sir. I was just pulled

21   over. They never took me to jail.

22 Q. In 2014 I'm talking about.

23 A. Oh, yes, yes.

24 Q. Okay, and would you agree that March 3rd, 2014,

25   is more than three years after April 12th, 2010?

1   A.   Yes, sir.

2   Q.   So going quickly back to when we talked about you

3       discussing things with the Public Defender's

4       investigator, do you recall telling him that you

5       probably lost a job in Milwaukee?

6   A.   Yes, vaguely.

7   Q.   Okay, and did you request to speak with the

8       Dubuque Task Force?

9   A.   Yes.

10   Q.   Okay.  Why did you request to speak with the

11       Dubuque Task Force?

12   A.   Because I was hoping that I could help myself

13       out.

14   Q.   Okay, and did you ever get a chance to talk with

15       them?

16   A.   What date are we talking about, sir, 2000 and --

17   Q.   It would have been in 2014 when you were

18       arrested, ultimately arrested for these charges.

19   A.   Yes.

20   Q.   You did talk to them?

21   A.   Yes.

22   Q.   And what information did you provide them?

23   A.   The things that they asked me, sir.

24   Q.   Okay.  Did you make any admissions as to selling

25       heroin?

1    A.    Yes.

2    Q.    Okay, and would that have been in this particular

3          case that you made admissions?

4    A.    I told them about some people that I was getting

5          it from.

6    Q.    Okay, so you never -- you never told them that

7          you were yourself selling heroin.

8    A.    Oh, no, no.

9    Q.    Okay.

10             MR. HOOVER:  I don't believe I have any

11         further questions.

12             MS. CHAPIN:  Is this a good time to take

13         a break?

14             (A break was taken from 11:00 a.m. to

15         11:04 a.m.)

16             MR. HOOVER:  Just remember that you're

17         still under oath.

18             THE WITNESS:  Okay.

19             MS. CHAPIN:  All right, so at this point

20         the State moves to enter into the record what's

21         been marked as State's Exhibits A, B, C and D,

22         and State's Exhibit E has already been entered.

23             MR. HOOVER:  I have no objection to

24         either foundation or their admittance.

25             MS. CHAPIN:  Thank you.

1   EXAMINATION BY MS. CHAPIN:

2   Q.   Mr. Rhodes, my name is Shea Chapin and I'm the

3        attorney for the State of Iowa today.  So it's my

4        understanding, sir, that when you got to the

5        Dubuque County Jail on April 1st of 2014 you

6        requested to speak with the Dubuque Drug Task

7        Force; is that right?

8   A.   Yes.

9   Q.   And at that time you faced up to twenty years in

10       prison for delivering heroin to their

11       confidential informants?

12  A.   Correct.

13  Q.   It's my understanding, Mr. Rhodes, that your

14       attorney, Scott Nelson, made an agreement with

15       the County Attorney's Office to allow you to what

16       we call proffer by meeting with the Dubuque Drug

17       Task Force; is that right?

18  A.   Correct, correct.

19  Q.   And based on the information that you provided,

20       you had actually agreed to proffer with the Task

21       Force; is that correct?

22  A.   Correct.

23  Q.   And the State was initially seeking to send you

24       to prison; is that right?

25  A.   Correct.

1  Q.  But once you cooperated, the State agreed to

2      suspend all of your time and just give you street

3      probation; isn't that right?

4  A.  No, ma'am.

5  Q.  Okay.  There was a different agreement?

6  A.  Yes.  The cooperation was supposed to be

7      initially me making some controlled buys and I

8      guess I was going to receive those benefits for

9      that, for that.

10 Q.  Okay, and you did not do the controlled buys?

11 A.  No, ma'am.

12 Q.  But your attorney was working on your behalf to

13     make sure that you didn't go to prison; is that

14     right?

15 A.  Initially if that's what you want to call it with

16     the proffer situation.

17 Q.  Okay, and earlier you had testified that you were

18     waiting in jail until you were released to the

19     facility.  Did I understand that correctly?

20 A.  Yes, ma'am.

21 Q.  But in looking at the judgment that the Court

22     did, it doesn't actually order you to go to the

23     facility.  It gives you street probation.  Do you

24     recognize that?

25 A.  Yes.

1   Q.   Okay, so you weren't actually going to the

2         facility based on this case.

3   A.   Yes, I was, ma'am.  You're kind of confusing me

4         because this case never -- this case resolved in

5         2016.  However, you're mentioning cases that were

6         from -- I mean, you're intertwining the 2014

7         dates.  That's what is initially confusing me,

8         ma'am.  I don't know -- which dates are you

9         actually talking about because I went to the

10        halfway house in 2016.

11   Q.   Okay, so you didn't go to the halfway house

12         because of the delivery of heroin case.

13   A.   Yes, I did, but it was in 2016 when I was picked

14         up again on it.

15   Q.   Okay.  Was that part of a -- was that part of

16         your pre-trial release?

17   A.   Yes.

18   Q.   Okay, so when you were sentenced in 2017 for

19         delivering heroin times two, you were not

20         sentenced to the Elm Street facility.

21   A.   When I was sentenced -- I was sentenced to --

22         when I was sentenced, I came from the Elm Street

23         facility and went and got sentenced, ma'am.

24   Q.   Okay, and you were not required to stay at the

25         facility any longer based on the delivery of

1   heroin cases.

2 A. Correct.

3 Q. So rather than being sentenced to prison for

4   twenty years, you received two ten-year suspended

5   prison sentences that would run concurrent if

6   revoked?

7 A. Correct.

8 Q. Your fines were suspended.

9 A. Yes.

10 Q. And you were placed on formal probation.

11 A. Correct.

12 Q. And Attorney Scott Nelson represented you in the

13   initial plea on this?

14 A. Correct.

15 Q. And he was the one that helped get you that deal?

16 A. I mean, helped is not the right word to use in

17   this time.  He's the one that facilitated the

18   deal, yes.

19 Q. But while he was your attorney you received the

20   deal for two ten-year suspended prison sentences

21   that would run concurrent if revoked.

22 A. Correct.

23 Q. And Scott Nelson was your attorney that helped

24   you not go to prison under the initial charges;

25   is that right, sir?

1    A.    Yes, yeah.  It's just when you're saying helped,

2          that's really not the ideal word to me, but I'm

3          understanding what you're saying and I'm going

4          along with what -- you know.

5    Q.    So we can agree that Mr. Nelson represented you.

6    A.    Yes.

7    Q.    Yes, okay, and it's also my understanding that

8          Mr. Nelson was able to negotiate with the State

9          to let you do an Alford plea; is that right?

10   A.    Yes.

11   Q.    So you didn't actually have to get up on the

12         stand or participate in your plea proceeding and

13         actually admit to delivering heroin to a

14         confidential informant.

15   A.    Correct.

16   Q.    I want to talk to you a little bit, Mr. Rhodes,

17         about your driver's license situation.  We've had

18         a lot of testimony today regarding your family

19         residence in Milwaukee.  How long have you had a

20         driver's license with the Milwaukee address

21         listed as your residence?

22   A.    Possibly thirty years.  My grandma helped me to

23         get my driver's license when I was sixteen so

24         probably more than thirty years.

25   Q.    And so for about thirty years that --

1  A.  Twenty-eight years.  I'm sorry.

2  Q.  So for about twenty-eight years her Milwaukee

3      address was listed as your place of residence?

4  A.  Correct.

5  Q.  You didn't relinquish that or give that up?

6  A.  No.  It's been on my driver's license since then,

7      twenty-eight years.

8  Q.  Sir, when you moved to Iowa you didn't actually

9      then relinquish your Wisconsin driver's license

10     to get an Iowa license, did you?

11 A.  No, I didn't.

12 Q.  Did you register to vote in Iowa?

13 A.  No, I didn't.  I wasn't voting in Milwaukee,

14     Wisconsin, either.

15 Q.  And it's my understanding, sir, that your

16     residency was kind of transient if you will for a

17     lot of the time between 2010 and 2014?

18 A.  Yes.

19 Q.  And is it my understanding, sir, that when you

20     were ordered to stay at the facility for your

21     pre-trial supervision, was that because you

22     didn't have a stable address and they couldn't

23     determine that you were going to stay in Iowa?

24 A.  No, actually it was because the address that

25     they -- the address that I was going to, they

1     denied it and I was trying to get out so that's

2     why I ended up going to the halfway house.

3  Q.   To kind of give you a stable place where they

4     knew you'd be.

5  A.   Correct.

6  Q.   And when you ended up going to prison for the

7     delivery of heroin, Mr. Rhodes, that was on a

8     probation violation?

9  A.   Correct.

10  Q.   And it was after you were in prison on the

11     probation violation when you were then sent to

12     federal prison?

13  A.   Yes.

14  Q.   How many post-conviction relief actions did you

15     file prior to going to federal prison in this

16     case?

17  A.   I think it's two, Madam.  I believe it's two.

18  Q.   Okay, two that you had filed prior to July?

19  A.   Prior to -- you know, I'm not -- I'm not

20     positively certain if it was two because I had

21     someone to help me fill it out to make sure that

22     I did it right at Anamosa and I think -- I think

23     it was two different forms that I filled out.

24  Q.   Okay, so you filed your first post-conviction

25     relief action when you were in prison.

1   A.   Correct.

2   Q.   After the probation revocation.

3   A.   Correct.

4   Q.   But prior to being sent to prison you didn't file

5        a post-conviction relief action against

6        Mr. Nelson?

7   A.   No, I filled -- prior to being sent to prison, I

8        filled out a direct appeal which resulted in a --

9        their response was that I waited too long.

10  Q.   Okay, but then you didn't file a post-conviction

11       relief after that before you went to prison?

12  A.   No, because it was during that time that I was --

13       I wasn't in Dubuque that long before I was sent

14       to prison.  By the time that they responded that

15       I was too late for that, I was going to prison in

16       the next two days.

17  Q.   And is it my understanding, Mr. Rhodes, that if

18       you're able to get -- if you're successful at

19       this post-conviction relief action, then you

20       would be taken out of maximum security prison in

21       the federal system?

22  A.   I'm not -- I'm not positive because they also

23       have me for -- they had me down as having

24       detainers for these cases, which I'm in the

25       process right now of getting these detainers

1        taken off because I shouldn't have a detainer and

2        that's what is entailing me to be in maximum

3        prison.

4  Q.   And for the record, Mr. Rhodes, do you understand

5        that if you are successful at this

6        post-conviction relief action and the State

7        prosecutes you, that you could end up going to

8        prison for twenty years on this matter rather

9        than the ten that you've previously received?

10  A.   Yes.

11           MS. CHAPIN:  Okay, nothing further.

12  A.   You say am I aware of that?

13  Q.   Yes.

14  A.   Yes, I'm aware.

15           MS. CHAPIN:  Okay, thank you.  Nothing

16        further.

17           MR. HOOVER:  Just a couple of questions,

18        Dante.

19  EXAMINATION BY MR. HOOVER:

20  Q.   Were you receiving mail in Iowa between 2010 to

21        2014?

22  A.   Yes, I'm sure -- yes, I was.

23  Q.   Okay, and as far as the PCR goes, when did you

24        first become aware of the statute of limitations

25        issue?

1    A.    This was not -- about the time we met.

2    Q.    Okay, so the first time you heard anything about

3          statute of limitations came from me.

4    A.    Yes.

5    Q.    Okay.  Had you been informed of that previously,

6          that that might have been an issue, may you

7          have -- would you have filed a PCR sooner?

8    A.    Definitely.

9    Q.    And are you aware that if the Court agrees that

10         your statute of limitations was violated, that it

11         would result in a dismissal?

12   A.    Are you saying am I aware of that?

13   Q.    Yes.

14   A.    Yes.

15   Q.    Okay, but you're also aware that if they find it

16         on other grounds, that you could be re-prosecuted

17         for those cases.

18   A.    Yes.

19               MR. HOOVER:  I don't have anything

20         further.  Thank you.

21               MS. CHAPIN:  I have nothing for you,

22         sir.  Thank you.

23               (The deposition was concluded at

24         11:19 a.m.)

25

1          CERTIFICATE OF SHORTHAND REPORTER

2

3          I, Dixie Shelton, a Certified Shorthand Reporter
in and for the States of Iowa and Illinois, do certify
that, pursuant to the agreement herein contained, this

4   deponent came before me at the aforementioned time and
place, who was sworn by me to testify to the truth and

5   nothing but the truth concerning the matters in
controversy in this cause; that the deponent was

6   thereupon examined under oath and the examination was
reduced to writing by me, and the printed transcript is a

7   true record of the testimony given by said deponent and
all objections made.

8

9          I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken,

10  and, further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or

11  financially interested in the action.

12          In witness whereof I have hereunto set my
hand this 16th day of March, 2020.

13

14

15                        _Dixie Shelton_____

16                        Dixie Shelton
                          Certified Shorthand Reporter

17                        IA License No. 600
                          IL License No. 084-003341

18                        P.O. Box 222
                          Stockton, Illinois 61085

19

20

21

22

23

24

25

DEPOSITION D.

MARY TERRELL, WITNESS

```
 1           IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

 2   DANTE KWAN RHODES,          )
                                 )
 3           Plaintiff,          )
                                 )    Case No. 01311 PCCV107576
 4   vs.                         )
                                 )    TELEPHONE DEPOSITION
 5   STATE OF IOWA,              )         OF
                                 )    MARY TERRELL
 6           Defendant.          )

 7

 8

 9   APPEARANCES:   ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
                    P.L.L.C., 110 West Main Street, P.O. Box
10                  306, Epworth, Iowa 52045, appeared on
                    behalf of the Plaintiff.
11
                    ASSISTANT COUNTY ATTORNEY SHEA M. CHAPIN,
12                  Dubuque County Attorney's Office, Dubuque
                    County Courthouse, 720 Central Avenue,
13                  Dubuque, Iowa 52001, appeared on behalf
                    of the Defendant.
14
     On cell phone:  Dante Kwan Rhodes, Plaintiff
15

16

17           Telephone Deposition of MARY TERRELL, taken

18   in the 3rd Floor South Courtroom, Dubuque County

19   Courthouse, 720 Central Avenue, Dubuque, Iowa, on

20   March 6, 2020, commencing at 9:16 o'clock a.m., before

21   Dixie Shelton, a Certified Shorthand Reporter in and

22   for the States of Iowa and Illinois, in the

23   above-entitled matter.

24

25
```

```
 1                        INDEX
 2      WITNESS                           EXAMINATION
 3  Mary Terrell        (Mr. Hoover)          3
 4                      (Ms. Chapin)          14
 5                      (Mr. Hoover)          19
 6
 7
 8                       EXHIBITS
 9                    (No exhibits)
10
11
12
13
14  Certificate of Shorthand Reporter        22
15
16
17
18
19
20
21
22
23
24
25
```

MARY TERRELL,

1

2 being first duly sworn, was examined and testified as

3 follows:

4 EXAMINATION BY MR. HOOVER:

5 Q. Miss Terrell, can you state your name and spell

6 your last name for the record?

7 A. Yes. Mary Terrell, T-e-r-r-e-l-l.

8 Q. Okay. And, Miss Terrell, where do you currently

9 reside?

10 A. I live in Fridley, Minnesota. Do you need the

11 address?

12 Q. Yeah, why don't you just give us the address.

13 A. 7895 East River Road, Unit 102, Fridley 55432.

14 Q. And are you currently employed?

15 A. Yes, I am.

16 Q. And where do you work?

17 A. NV5. It's N as in Nancy, V as in Victor, 5.

18 Q. And what do you do for them?

19 A. I am an assistant -- or a senior project

20 coordinator.

21 Q. And how long have you been employed there?

22 A. Twenty years.

23 Q. And how long have you lived in Minnesota?

24 A. Thirty years.

25 Q. Okay, and --

1    A.    Actually I believe it's twenty -- twenty-nine

2         years.

3    Q.    And is your mother still living?

4    A.    Yes, she is.

5    Q.    And where does she reside?

6    A.    Milwaukee, Wisconsin.

7    Q.    And do you know what the address is in Milwaukee,

8         Wisconsin?

9    A.    Well, her home address is 2355 North 5th Street

10        55 -- no, 53212. However, currently she is in

11        Symphony Nursing Home in Glendale, Wisconsin.

12    Q.    Okay, and how long has she been there?

13    A.    She's been in Symphony approximately five or six

14        months, but prior to that she was in a unit of

15        the hospital and -- or at one point she was in a

16        different nursing home.

17    Q.    Okay, and was she residing at that address that

18        you gave us in the years between 2010 and 2014?

19    A.    Yes.

20    Q.    Okay, and were her -- or I guess how do you know

21        my client, Dante Rhodes?

22    A.    Dante is my son, my oldest child.

23    Q.    Okay, and I'm assuming that you love your oldest

24        child.

25    A.    Yes, unconditionally.

1   Q.   Okay, and would you give false testimony to help

2       your son?

3   A.   No, not at all, and he knows that about me.

4   Q.   Okay. Now, can you tell me a little bit about

5       Dante between the years of 2010 and 2014?

6   A.   Yes. Those are some pretty hard years for us,

7       the family, because Dante's drug problem really

8       came to light to us and also those were the years

9       that we were really trying to get him to get

10      treatment, and during that time he somehow with

11      his partner ended up making Iowa his home, don't

12      know how that came to pass but it was -- he was

13      either in Iowa or he -- when he did come home, it

14      was on the condition that he would try to get

15      help, but that never lasted at all and every time

16      he would leave and go back to Iowa.

17   Q.   When he was in treatment, what was the longest

18      period of time that he stayed in a treatment

19      facility?

20   A.   I would say -- this is just a guess because there

21      were so many attempts but probably about two to

22      three weeks.

23   Q.   Okay, and --

24   A.   And again this is just a guess.

25   Q.   Okay. All right. Would you say that it was

1      anywhere near a year that he would have stayed in

2      a treatment program?

3  A.  No.

4  Q.  So you think --

5  A.  Because not consistent -- not consistently

6      because what would happen, if we'd get Dante into

7      treatment, he'd stay for a little bit and then

8      he'd leave and go back to Iowa and whatever

9      happened there, he would come back and we'd try

10     it again because that was the only condition that

11     he could stay here at all was if he came and

12     immediately went to a treatment facility, so over

13     the course of the years that's why I've lost

14     count of how many times we tried and even through

15     the years, even prior and subsequent to 2010 and

16     2014, we never stopped so --

17  Q.  Okay.

18  A.  That's why it's hard to give actual, you know,

19     details.

20  Q.  So do you know a Tiffany Jackson?

21  A.  Yes.

22  Q.  And who was Tiffany Jackson?

23  A.  Tiffany was his partner particularly during those

24     years and she was one of the reasons that Dante

25     was in Iowa, because she was a dancer and she

SHELTON REPORTING (815)947-3141

1    danced in clubs in Iowa and that's how she

2    supported Dante and herself.

3  Q.  Okay, and you were aware that Mr. Rhodes lived in

4    Dubuque, Iowa; is that correct?

5  A.  Yes.

6  Q.  And --

7  A.  Uh-huh.

8  Q.  Do you know about what year he left Dubuque,

9    Iowa?

10  A.  Well, Dante was between Dubuque and Ottumwa,

11    okay, and so there was different times that he

12    was there.  I do recall that the last -- I'm

13    trying to remember, three years ago, would have

14    been 2017, was really the last time that year

15    that we were kind of able to get him to leave

16    Iowa kind of for the longest period, but he ended

17    up going back again so I'd say 2017 because --

18    and I know that because we were giving my mom an

19    eightieth birthday and Dante was supposed to

20    attend and he ended up back in Iowa and these

21    final events ultimately happened.

22  Q.  Now, your mother -- what was your mother's name?

23  A.  Bettye, and it's B-e-t-t-y-e, Coleman,

24    C-o-l-e-m-a-n.

25  Q.  And would Bettye have allowed Mr. Rhodes to

1       reside with her if he was using narcotics?

2   A.  Oh, no, not at all.

3   Q.  Do you think Mr. Rhodes would have went to live

4       with your mother if he was actively using

5       narcotics?

6   A.  No, not at all.

7   Q.  Okay.

8   A.  And even if she had wanted to, she knows that we

9       would not have allowed it.  I would have went and

10      gotten him out of the house even if he tried.

11  Q.  Okay, so between the years of 2010 and 2014 do

12      you know of any time that Mr. Rhodes would have

13      been living with your mother?

14  A.  No, he would not have been living with her.  He

15      would come and visit and that is because his son

16      was living with my mother at that time but, no,

17      he did not live with her.

18  Q.  What is his son's name?

19  A.  His name is Dante Rhodes as well.

20  Q.  Okay.  Now, I think you testified earlier that

21      you knew he was living in Ottumwa.  How did you

22      know he was living in Ottumwa?

23  A.  Well, because it was the first I ever heard of

24      the city or town of Ottumwa.  I had sent him

25      money to Ottumwa and I also had -- he had told me

1     about a place that Tiffany was dancing while she

2     was in Ottumwa so that's how I knew he was there,

3     because that's how I even heard of the place.

4  Q.  Okay, and what was the name of that place she was

5     dancing?

6  A.  Something like Chills and -- Chills and Thrills

7     and -- something like that, Chills and Thrills, I

8     think.

9  Q.  Okay, and how often did you send him money in

10    Ottumwa?

11 A.  You know, I don't even remember how often it was

12    but sometimes, because Dante would not have an

13    I.D., I would send it to Tiffany for her to give

14    it to Dante.  It wasn't very often because I knew

15    that, you know, he wasn't living in the right way

16    but if it was for something where either he was

17    promising that he would try to come home and get

18    help or, you know, there were a couple times if

19    he needed food or something like that, I would

20    break and go ahead and send it to him but --

21 Q.  And do you recall about what that time frame was,

22    what years that you were sending him money?

23 A.  Oh, I know it was during that 2 -- I would say

24    2011, 2011, 2012, 2013 time frame, and one of the

25    reasons I really remember 2012 was because we had

1      encouraged him and Tiffany -- they came for -- we

2      had scheduled a family intervention and that was

3      2012 and we had sent money for them to come down

4      to Minneapolis and we all -- we had an

5      intervention.

6  Q.   Okay.

7  A.   It was unsuccessful.

8  Q.   Okay. Did you attempt to locate any records of

9      you sending the money?

10  A.   Yes, and I actually have sent money in various

11      ways and one of them was Walmart to Walmart and I

12      had tried to get a statement from them but they

13      said it takes like ten to fourteen business days,

14      which would mean it wouldn't -- you know, in time

15      for this hearing but it -- basically like Western

16      Union you don't put the city, you put just the

17      state, so I'm hoping the record will show where

18      he picked it up.

19  Q.   Okay, and are you willing to provide that to me

20      once you receive it?

21  A.   Yeah.

22  Q.   Okay.

23  A.   Yes. One of the other things I'm going to see if

24      I can retrace is maybe get some phone records

25      during that time, but I've changed phone carriers

1               since then and so --

2       Q.      Okay.

3       A.      -- I don't know what it's going to take to be

4               able to get that but that's one of the -- I've

5               been trying to think of every type of way that I

6               can get some type of confirmation of Dante during

7               that time and like I told him, when you're not

8               living a productive life where you have a job or

9               a phone or things like that, it's very hard, and

10              he can barely remember his life in Iowa because

11              of his state of mind so it's even harder for us

12              to put together something and I've never been to

13              Ottumwa in my life.

14      Q.      So would you have been able to -- strike that.

15              What was Mr. Rhodes' drug of choice?

16      A.      Heroin.  I believe it was -- began with the

17              pills, the pain pills.

18      Q.      And then at some point he switched over to

19              heroin?

20      A.      Yes.

21      Q.      Okay.

22      A.      But I'm so -- I'm not really knowledgeable about

23              the use of those drugs but I know that one of the

24              issues Dante had was always going to doctors to

25              try to get -- going to various doctors to try to

1    get pain pills, so I guess it was both the pills

2    and the heroin.

3  Q.  Okay.  Did you know any time where Mr. Rhodes

4    would have been living in Arizona?

5  A.  He went to visit -- actually my best friend who's

6    deceased, her son lived in Arizona and so Dante

7    went and visited Andre Flanagan, that's his name,

8    in Arizona.

9  Q.  And would that --

10  A.  But he did not live there.

11  Q.  Okay.

12  A.  He went and that didn't work out and even the

13    visit, he and Andre had a falling out and that's

14    probably because, you know, they were both not

15    living right.

16  Q.  Okay.  Would that have been around 2017?

17  A.  Yes, I would say so and I would -- yeah, I would

18    say so.

19  Q.  Okay.

20  A.  It would not surprise me if that was the year.  I

21    just can't say --

22  Q.  Sure.

23  A.  -- one hundred percent, but that sounds about

24    right --

25  Q.  Okay.

1    A.    -- when Dante went to stay there.

2    Q.    How certain are you that Dante did not live in

3          Milwaukee, Wisconsin, from the years 2010 to

4          2014?

5    A.    I'm especially a hundred percent sure because not

6          only was Dante not wanting -- able to live with

7          family members without getting treatment, because

8          of Dante's life-style there were people in

9          Milwaukee that he had over the years swindled and

10         even people in the neighborhood whereas it was

11         kind of dangerous for him to be in Milwaukee,

12         which is another reason I believe he went to Iowa

13         but, you know, why he chose Iowa, I don't know.

14    Q.    Okay.

15    A.    But that was one of the other reasons that he

16         wasn't in Milwaukee, because there were people

17         that didn't want to do much -- as a result,

18         allowed his drug activity.

19    Q.    Okay.  Hold on a minute.  I'm going to just make

20         sure there's not any other questions that Dante

21         would like me to ask.

22    A.    Yes.  I'm sorry.  After a while when you talk

23         about it, it kind of -- kind of gets to me.

24    Q.    Sure.

25              (Mr. Hoover is speaking to the Plaintiff

1      on his cell phone.)

2             MR. HOOVER: At this time I don't have

3      any further questions for you, Mary. The County

4      Attorney is going to have a few questions for

5      you, though.

6  EXAMINATION BY MS. CHAPIN:

7  Q.   Good morning, ma'am.

8  A.   Okay.

9  Q.   Good morning, ma'am.

10  A.   Good morning.

11  Q.   Can you hear me okay?

12  A.   I can.

13  Q.   Okay. My name is Shea Chapin. We met when you

14      were at the courthouse last time so it's good to

15      have you with us again. I'm just going to ask

16      you --

17  A.   Thank you.

18  Q.   I'm just going to ask you --

19  A.   I appreciate you allowing me to do this over the

20      phone as well.

21  Q.   Oh, we completely understand. The Midwest can be

22      difficult to travel in in the wintertime --

23  A.   Yes.

24  Q.   -- so that's no problem. So, ma'am, a few

25      minutes ago you testified that Mr. Rhodes would

1      often come home or, you know, leave Iowa to come

2      home.  Where is the home that you're referring

3      to?

4   A.    Well, I consider whenever he's with me or our

5         family in Milwaukee, which is where he was born

6         and raised, home, you know.

7   Q.    Okay.

8   A.    So when I say home, I'm saying when he's with

9         family.

10  Q.    Okay, so when he would leave and go home, he

11        would either go to be with you in Minnesota or

12        your family in Milwaukee, Wisconsin?

13  A.    Yeah.

14  Q.    And is it fair to say that Mr. Rhodes was

15        somewhat transient in moving, where he stayed?

16        Would that be a fair description?

17  A.    Yeah.

18  Q.    Okay.

19  A.    Yes, I would, but as I say that, during those

20        years he was primarily in Iowa, whether it was

21        Dubuque or Ottumwa, because of not able to stay

22        with family for any period of time unless he went

23        for treatment and because his life-style had kind

24        of put him at risk when he was in Milwaukee.

25        There were people that even would come by my --

1     my mom's house to look for Dante because they

2     were trying to -- because he had swindled them

3     out of money or whatever, so that was not a safe

4     place for him any longer as well.

5    Q.   Okay, and you had testified that you have never

6     been to Ottumwa.  Is that still true?

7    A.   Yeah.

8    Q.   Okay, so you never went to Ottumwa to stay with

9     Dante or visit him?

10   A.   No.

11   Q.   And you had mentioned that oftentimes you would

12     wire the money to Tiffany Jackson to give to

13     Mr. Rhodes; is that right?

14   A.   I would send it either to Tiffany or to Dante,

15     depending on which one had identification or was

16     able to get to -- you know, get to some kind of

17     pickup place and it wasn't necessarily always

18     Walmart.  Sometimes it would be a MoneyGram or

19     Western Union.

20   Q.   Okay.

21   A.   It was depending on where they were at whatever

22     particular time.

23   Q.   And are you familiar with why Mr. Rhodes would

24     not have had an I.D.?

25   A.   Well, Dante's always been a person to have --

1      with his life been unable to keep up with

2      personal belongings and I guess as a result of

3      his transience, he would lose things all the time

4      and he -- you know, it was definitely not

5      stable --

6  Q.   Okay.

7  A.   -- I'm guessing or, you know, he'd end up being

8      arrested or whatever.  He would always lose

9      things, you know, leave things behind.

10  Q.   And, Miss Terrell, did you ever visit Mr. Rhodes

11      in Dubuque?

12  A.   No, I did not.

13  Q.   So you're not familiar with what type of

14      residence he had?

15  A.   And I don't know if it was in Dubuque or in

16      Ottumwa, but at one point he and Tiffany were

17      staying with an older gentleman.  I can't -- I

18      think his first name was Ken but I can't remember

19      his last name, but they were living with him for

20      a period of time as well when they had I guess

21      lost their place of residence --

22  Q.   Okay.

23  A.   -- whatever, yeah.  That man's son had a problem

24      with that as well and so --

25  Q.   Okay.

1   A.   That's how that ended up being terminated.

2   Q.   Okay.  And, Miss Terrell, are you familiar with

3        the county that Milwaukee, Wisconsin, is in?

4   A.   Milwaukee?

5   Q.   Yeah.

6   A.   Milwaukee County.

7   Q.   And is Waukesha County up by Milwaukee?

8   A.   Yeah.

9   Q.   Okay.  Are you familiar with the fact that

10       Mr. Rhodes was arrested in Waukesha County,

11       Wisconsin, in November of 2013?

12   A.   Oh, yeah.

13   Q.   Okay.

14   A.   We weren't surprised.  We didn't even know that

15       he was -- really didn't know he was even in

16       the -- back in the city because sometimes Dante

17       would go in and out.

18   Q.   Okay.  Are you familiar that he was using your

19       mom's address?

20   A.   Yes, but that has been -- he has used my mom's in

21       Milwaukee, has used my mom's address for years.

22       That's the only stable address that he was able

23       to use.

24   Q.   Okay.  Would you say that your mom's address in

25       Milwaukee was maybe the place where he would

```
 1         declare his stable residency?

 2    A.   Not once he became a user.  When he was -- my mom

 3         lived in that -- at that address for sixty years

 4         so that's the family home if you will --

 5    Q.   Okay.

 6    A.   -- and not only Dante but other family members

 7         also use my mother's address, and even I use my

 8         mother's address for certain, you know, mail in

 9         Wisconsin if I need for -- like for my grandson's

10         insurance --

11    Q.   Okay.

12    A.   -- I put -- you know, things like that so that's

13         just -- people use my mother's address that don't

14         live there just because it's never changed.

15    Q.   It's like a stable family residence?

16    A.   Yes.

17              MS. CHAPIN:  Okay.  Thank you.  I don't

18         think I have anything more for you, ma'am.  Thank

19         you so much.

20              THE WITNESS:  Thank you.

21              MR. HOOVER:  Just a couple more

22         questions, Mary.

23    EXAMINATION BY MR. HOOVER:

24    Q.   Now, again, if -- you said that he was transient.

25         Did you know -- when you say he's transient, how
```

1  do you know that he wasn't living in Milwaukee

2  during that time frame?

3 A. Well, for one thing, if Dante were in Milwaukee

4  for any period of time, we have -- that's our

5  home. We have tons of family and friends there.

6  He would not have been able to be in the city

7  long without somebody not seeing him, okay, not

8  for a long period of time and also Dante with all

9  of his faults and whatever, he's a very loving

10  person, he's a loving child, and he would always

11  want to check on my mother because he is very

12  close to his grandmother and he would also check

13  on his son, so there's no way that he would be

14  living in Milwaukee and even also Deron, my

15  nephew, is like a brother to him so there's no

16  way that he would be living in Milwaukee and

17  those three people not know about it.

18 Q. Okay, and did he sometimes go back to Milwaukee

19  to visit?

20 A. Yes.

21 Q. Okay, and sometimes did he come up to Minnesota

22  to visit?

23 A. Yes.

24 Q. And when he came up for treatment, did he move

25  all his belongings to either Minnesota or

1          Milwaukee when he did that?

2    A.    No, not really because when he would come, it

3          would usually be in a crisis situation and that's

4          another reason that his I.D.s were always

5          misplaced, because he would usually be in a

6          crisis and, as I said, he couldn't stay unless he

7          went to treatment so most of his visits were

8          under, you know, some kind of a drug bottom,

9          okay, and then we'd try to get him clean but, as

10         I said, he would always go back to Iowa and to

11         Tiffany at that time as well because she was a

12         big enabler for him.

13   Q.    Okay.

14              MR. HOOVER:  No further questions.

15         Thank you, Mary.

16              MS. CHAPIN:  I have nothing further for

17         you, ma'am.  Thank you.

18              THE WITNESS:  Uh-huh, thank you.

19              MR. HOOVER:  Okay.  You have a good day,

20         Mary.

21              THE WITNESS:  You, too.  Thank you.

22              (The deposition was concluded at 9:47

23         a.m.)

24

25

1            CERTIFICATE OF SHORTHAND REPORTER

2

3        I, Dixie Shelton, a Certified Shorthand Reporter
in and for the States of Iowa and Illinois, do certify
that, pursuant to the agreement herein contained, this

4   deponent came before me at the aforementioned time and
place, who was sworn by me to testify to the truth and

5   nothing but the truth concerning the matters in
controversy in this cause; that the deponent was

6   thereupon examined under oath and the examination was
reduced to writing by me, and the printed transcript is a

7   true record of the testimony given by said deponent and
all objections made.

8

9        I further certify that I am neither attorney or
counsel for, nor related to or employed by, any of the
parties to the action in which this deposition is taken,

10  and, further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or

11  financially interested in the action.

12       In witness whereof I have hereunto set my
hand this 16th day of March, 2020.

13

14

15              *Dixie Shelton*
            _____
16          Dixie Shelton
            Certified Shorthand Reporter
            IA License No. 600
17          IL License No. 084-003341
            P.O. Box 222
18          Stockton, Illinois 61085

19

20

21

22

23

24

25

DEPOSITION E.

SHANE FLESHER, WITNESS

```
 1            IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

 2   DANTE KWAN RHODES,          )
                                 )
 3            Plaintiff,         )
                                 )   Case No. 01311 PCCV107576
 4   vs.                         )
                                 )   DEPOSITION OF
 5   STATE OF IOWA,              )   SHANE FLESHER
                                 )
 6            Defendant.         )

 7

 8

 9   APPEARANCES:    ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
                     P.L.L.C., 110 West Main Street, P.O. Box
10                   306, Epworth, Iowa 52045, appeared on
                     behalf of the Plaintiff.
11
                     ASSISTANT COUNTY ATTORNEY SHEA M. CHAPIN,
12                   Dubuque County Attorney's Office, Dubuque
                     County Courthouse, 720 Central Avenue,
13                   Dubuque, Iowa 52001, appeared on behalf
                     of the Defendant.
14
     On cell phone:  Dante Kwan Rhodes, Plaintiff
15

16

17            Deposition of SHANE FLESHER, taken in the 3rd

18   Floor South Courtroom, Dubuque County Courthouse, 720

19   Central Avenue, Dubuque, Iowa, on March 6, 2020,

20   commencing at 9:06 o'clock a.m., before Dixie Shelton,

21   a Certified Shorthand Reporter in and for the States of

22   Iowa and Illinois, in the above-entitled matter.

23

24

25
```

1                           INDEX

2        WITNESS                          EXAMINATION

3    Shane Flesher        (Mr. Hoover)            3

4                         (Ms. Chapin)            6

5                         (Mr. Hoover)            6

6

7

8                          EXHIBITS

9        Exhibit                          Offered

10   State's Exhibit E                       4

11

12

13

14

15   Certificate of Shorthand Reporter          8

16

17

18

19

20

21

22

23

24

25

1                        SHANE FLESHER,

2    being first duly sworn, was examined and testified as

3    follows:

4    EXAMINATION BY MR. HOOVER:

5    Q.    Can you state your name and spell your name for

6          the record?

7    A.    Shane Flesher, F-l-e-s-h-e-r.

8    Q.    Okay, and what is your current occupation?

9    A.    I'm an investigator for the Public Defender's

10         Office in Dubuque.

11   Q.    And how long have you been in that role?

12   A.    Sixteen years.

13   Q.    Okay, and there's an exhibit in front of you; is

14         that correct?

15   A.    Yes.

16   Q.    And I believe it's been marked as State's

17         Exhibit E?

18   A.    Correct.

19   Q.    Do you recognize that document?

20   A.    Yes.

21   Q.    And what -- what do you -- can you tell the Court

22         what that document is?

23   A.    It's a booking sheet from the Dubuque County Jail

24         that I made some notes on that is for Dante

25         Rhodes.

1   Q.   Okay, and does that appear to be your

2        handwriting?

3   A.   The bottom portion is.  The top right is not but

4        the rest of it is.

5   Q.   And does it appear to be a true and accurate copy

6        of the document that you had that you wrote notes

7        on?

8   A.   Yes.

9   Q.   Okay.

10           MR. HOOVER:  We'll just move to admit

11        Exhibit E.  I think the other ones have been

12        admitted.  No.  We'll talk about that later.

13           MS. CHAPIN:  We have no objection to

14        Exhibit E being admitted.

15   Q.   All right.  Do you write down everything that's

16        said?

17   A.   Not everything.

18   Q.   Okay, and do you recall talking to Mr. Rhodes

19        specifically?

20   A.   I don't have any independent recollection of

21        speaking with him.

22   Q.   Okay, so you wouldn't remember any other things

23        that he would say that haven't been memorialized

24        there.

25   A.   No.

1   Q.   And he could have told you other things; correct?

2   A.   He could have told me other things. Generally if

3        he told me something that I thought was going to

4        be beneficial to him, I would have made note of

5        it.

6   Q.   Okay. Did you guys talk about where he had been

7        between 2010 to 2014?

8   A.   I see in my notes here that he lived in Dubuque

9        from 2010 to 2012.

10   Q.   Okay, and was there any discussion about where he

11        was living between 2012 and 2013?

12   A.   Not that I can recall.

13   Q.   Did you have -- do you recall if there were any

14        discussions with Mr. Rhodes about whether or not

15        there may be a statute of limitations issue?

16   A.   I don't recall that.

17   Q.   And you're not an attorney; correct?

18   A.   That's right.

19   Q.   So you wouldn't have given him any legal advice;

20        correct?

21   A.   Correct.

22   Q.   Okay.

23            (Mr. Hoover is speaking to the Plaintiff

24        on his cell phone.)

25            MR. HOOVER: No further questions.

1          MS. CHAPIN:  Mr. Flesher, I just have a

2      brief question for you.

3  EXAMINATION BY MS. CHAPIN:

4  Q.   You indicated that the handwriting at the top of

5      the page is not your handwriting.  Do you

6      recognize whose handwriting it is?

7  A.   That would be Christopher Welch.

8  Q.   And how do you know Christopher Welch?

9  A.   Christopher Welch was an attorney at our office

10      during that time period.

11  Q.   So the handwriting on this booking sheet would be

12      either from you or another attorney in your

13      office?

14  A.   Right, either myself as an investigator or

15      Mr. Welch as an attorney.

16          MS. CHAPIN:  Okay.  Thank you.  Nothing

17      further.

18  EXAMINATION BY MR. HOOVER:

19  Q.   Mr. Welch didn't end up representing Mr. Rhodes

20      very long; correct?

21  A.   I'm not sure who was assigned to represent him.

22      It looks like from the booking sheet that

23      Mr. Welch would have made the argument for him at

24      his initial appearance.

25  Q.   Okay, and then are you aware of whether or not a

1    different counsel was eventually appointed for

2    Mr. Rhodes?

3    A.    Yeah.    I learned since I've been presented with

4          this document this year that Scott Nelson was

5          appointed to represent him at some point.

6    Q.    Okay.

7                    MR. HOOVER:    No further questions.

8                    MS. CHAPIN:    I have nothing further.

9          Thank you, sir.

10                   THE WITNESS:    Thank you.

11                   MS. CHAPIN:    Have a good day.

12                   (The deposition was concluded at 9:10

13         a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF SHORTHAND REPORTER

        I, Dixie Shelton, a Certified Shorthand Reporter in and for the States of Iowa and Illinois, do certify that, pursuant to the agreement herein contained, this deponent came before me at the aforementioned time and place, who was sworn by me to testify to the truth and nothing but the truth concerning the matters in controversy in this cause; that the deponent was thereupon examined under oath and the examination was reduced to writing by me, and the printed transcript is a true record of the testimony given by said deponent and all objections made.

        I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

        In witness whereof I have hereunto set my hand this 16th day of March, 2020.




                                    _Dixie Shelton_____
                                    Dixie Shelton
                                    Certified Shorthand Reporter
                                    IA License No. 600
                                    IL License No. 084-003341
                                    P.O. Box 222
                                    Stockton, Illinois 61085

DEPOSITION F.

IOWA DUBUQUE COUNTY NO. PCCV107576 - COURT OF APPEALS
NO. 21-0220 "PROCEDENDO"

# IN THE COURT OF APPEALS OF IOWA
## No. 21–0229
### Dubuque County No. PCCV107576
### PROCEDENDO

**DANTE KWAN RHODES,**
    Applicant-Appellant,

vs.

**STATE OF IOWA,**
    Respondent-Appellee.

To the Iowa District Court for the County of Dubuque:

Whereas, there was an appeal from the district court in the above-captioned case to the supreme court, and the supreme court transferred the case to the court of appeals. The appeal is now concluded.

Therefore, you are hereby directed to proceed in the manner required by law and consistent with the opinion of the court.

In witness whereof, I have hereunto set my hand and affixed the seal of the court of appeals.

ELECTRONICALLY FILED    JUN 1, 2022    CLERK OF SUPREME COURT

Copies to:

Mary Kathleen Conroy
State Appellate Defender's Office
Fourth Floor Lucas Building
Des Moines, IA 50319

Timothy Mark Hau
Assistant Attorney General
Hoover Building Second Floor
Des Moines, IA 50319

Dubuque County District Court



IOWA APPELLATE COURTS

State of Iowa Courts

**Case Number**
21-0229

**Case Title**
Rhodes v. State

So Ordered

Donna M. Humpal, Clerk

Electronically signed on 2022-06-01 15:34:37

# IN THE COURT OF APPEALS OF IOWA

## No. 21–0229

### Dubuque County No. PCCV107576

## PROCEDENDO

**DANTE KWAN RHODES,**
    **Applicant-Appellant,**

**vs.**

**STATE OF IOWA,**
    **Respondent-Appellee.**

_____

To the Iowa District Court for the County of Dubuque:

Whereas, there was an appeal from the district court in the above-captioned case to the supreme court, and the supreme court transferred the case to the court of appeals. The appeal is now concluded.

Therefore, you are hereby directed to proceed in the manner required by law and consistent with the opinion of the court.

In witness whereof, I have hereunto set my hand and affixed the seal of the court of appeals.

ELECTRONICALLY FILED    JUN 1, 2022    CLERK OF SUPREME COURT

Copies to:

Mary Kathleen Conroy
State Appellate Defender's Office
Fourth Floor Lucas Building
Des Moines, IA 50319

Timothy Mark Hau
Assistant Attorney General
Hoover Building Second Floor
Des Moines, IA 50319

Dubuque County District Court

EXHIBIT (1)

DECEMBER 12, 2016 PLEA, TRANSCRIPT OF PROCEEDINGS
    STATE OF IOWA        CASE NO. FECR093623
        V.          S.CT. 21-0229
    DANTE RHODES
       HON. THOMAS A. BITTER JUDGE
  DUBUQUE COUNTY COURTHOUSE, DUBUQUE, IOWA

1    IN THE IOWA DISTRICT COURT IN AND FOR DUBUQUE COUNTY

2   STATE OF IOWA,                        )
                                          ) CASE NO. FECR093623
3            Plaintiff,                   ) S.Ct. No. 21-0229
                                          )
4   vs.                                   ) TRANSCRIPT OF
                                          ) PLEA PROCEEDINGS
5   DANTE RHODES,                         )
                                          )
6            Defendant.                   )

7                      December 12, 2016
                    Dubuque County Courthouse
8                       Dubuque, Iowa

9   BEFORE:  Hon. Thomas A. Bitter, Judge

10  APPEARANCES:

11          BRIGIT BARNES
            ASSISTANT DUBUQUE COUNTY ATTORNEY
12          DUBUQUE COUNTY COURTHOUSE
            DUBUQUE, IOWA
13              APPEARED ON BEHALF OF STATE OF IOWA.

14          SCOTT NELSON
            ATTORNEY AT LAW
15          3003 ASBURY ROAD, SUITE 1
            DUBUQUE, IA   52001
16              APPEARED ON BEHALF OF DEFENDANT.

17

18  REPORTER:        KELLY NEYEN, CSR, RPR
                     DUBUQUE COUNTY COURTHOUSE
19                   720 CENTRAL AVENUE, THIRD FLOOR
                     DUBUQUE, IA   52001
20

21

22                                   RECEIVED
                                     APR 1 2 2021
23                                   APPELLATE DEFENDER

24  TRANSCRIPT APPEALED: FEBRUARY 19, 2021
    TRANSCRIPT ORDERED: MARCH 2, 2021
25  TRANSCRIPT DELIVERED: MARCH 23, 2021

```
 1                          INDEX

 2

 3

 4

 5

 6                         EXHIBIT

 7    EXHIBIT              OFFERED      ADMITTED

 8

 9

10

11

12

13

14

15

16    CERTIFICATE OF SHORTHAND REPORTER......... 14

17

18

19

20

21

22

23

24

25
```

1                  (Plea proceedings commenced at 10:27 a.m.,

2  December 12, 2016.)

3                  THE COURT:  Okay.  This is In the Iowa

4  District Court in and For Dubuque County.  It's the

5  State of Iowa versus Dante Rhodes, FECR093623 and

6  SRCR090597.  The Defendant appears personally along

7  with Attorney Scott Nelson.  The State of Iowa appears

8  by Assistant County Attorney Brigit Barnes.

9                  The matter's scheduled for plea proceeding

10  today.  Mr. Nelson has given me a plea memo which is

11  signed by both attorneys, indicates the Defendant will

12  plead to Counts I and II as charged in the FE file.

13  The State will recommend both counts suspended and

14  concurrent to each other, and the Defendant will join in

15  that recommendation.

16                  Mr. Rhodes, do you understand the terms of

17  the plea agreement?

18                  THE DEFENDANT: Yes.

19                  THE COURT:  Have you had enough time to

20  discuss the plea with your attorney?

21                  THE DEFENDANT: Yes.

22                  THE COURT:  Any questions about the plea

23  itself?

24                  THE DEFENDANT: Um, would I be able to take

25  the plea under the Alford plea?

| | |
|---|---|
| 1 | THE COURT: Probably. We could probably do |
| 2 | that today. Is that your desire? |
| 3 | THE DEFENDANT: Yes. |
| 4 | THE COURT: We can probably do that today, |
| 5 | yes. Any other questions you have? |
| 6 | THE DEFENDANT: No. |
| 7 | THE COURT: Has anyone threatened you or |
| 8 | forced you to plead guilty here today? |
| 9 | THE DEFENDANT: No. |
| 10 | THE COURT: Has anyone made any promises to |
| 11 | you other than the plea bargain? |
| 12 | THE DEFENDANT: No. |
| 13 | THE COURT: How old are you? |
| 14 | THE DEFENDANT: Forty. |
| 15 | THE COURT: What's your highest level of |
| 16 | education? |
| 17 | THE DEFENDANT: I got some college. |
| 18 | THE COURT: Okay. So you can read and write |
| 19 | just fine? |
| 20 | THE DEFENDANT: Yeah. |
| 21 | THE COURT: Are you currently under the care |
| 22 | of a doctor? |
| 23 | THE DEFENDANT: No. |
| 24 | THE COURT: Do you take any medication? |
| 25 | THE DEFENDANT: No. |

1          THE COURT:   Is there any medication you're

2    supposed to be taking?

3          THE DEFENDANT: No.

4          THE COURT:   As you sit here today, are you

5    under the influence of alcohol or any other drug?

6          THE DEFENDANT: No.

7          THE COURT: Are you currently on probation or

8    parole anywhere?

9          THE DEFENDANT: No.

10          THE COURT:   Do you have any other criminal

11    charges currently pending against you anywhere?

12          THE DEFENDANT: No.

13          THE COURT:   In this case the Trial

14    Information was filed on May 16 of 2014.   The Trial

15    Information is the official charging document against

16    you.   It charged you with two counts of delivery of

17    heroin.   Have you read through those charges?

18          THE DEFENDANT: Yes.

19          THE COURT:   Have you discussed those with

20    your attorney?

21          THE DEFENDANT: Yes.

22          THE COURT:   Are you satisfied with his

23    services?

24          THE DEFENDANT: Yes.

25          THE COURT:   Mr. Nelson, are you aware of any

1    defenses your client may have other than a general

2    denial?

3              MR. NELSON: No, Your Honor.

4              THE COURT:  Mr. Rhodes, Counts I and II are

5    both delivery of heroin.   They are each Class C

6    felonies, each one would carry a maximum of ten years in

7    prison, and each would carry a fine of between $1,000

8    and I believe $10,000.

9              MS. BARNES: $50,000, Your Honor.

10             THE COURT:  Okay.   It is.   The fine would

11   be a minimum of $1,000 on each count, a maximum of

12   50,000 on each count.   Do you understand that?

13             THE DEFENDANT: Yes.

14             THE COURT:  If these two sentences ran

15   consecutive to each other, you'd be looking at up to 20

16   years in prison.   Do you understand that?

17             THE DEFENDANT: Yes.

18             THE COURT:  If I read the statute correctly,

19   if prison is imposed, there would be a one-third

20   mandatory minimum on each count that you'd have to

21   serve.   Do you understand that?

22             THE DEFENDANT: Yes.

23             THE COURT:  Okay.   Lastly, do you

24   understand that the terms of your plea agreement are not

25   binding on the sentencing judge, meaning the sentencing

1    judge can do something different, including sending you

2    to prison for up to 20 years, is that clear?

3                    THE DEFENDANT: Yes.

4                    THE COURT:  Do you still want to go ahead

5    with your plea here today?

6                    THE DEFENDANT: Yes.

7                    THE COURT:  All right.   If you're going to

8    plead guilty, there are certain rights that you'll have

9    to give up today, and we're going to go through those

10   now.   First of all, you do not have to plead guilty

11   here today.  Do you understand that?

12                   THE DEFENDANT: Yes.

13                   THE COURT:  You're entitled to a speedy and

14   public trial by jury.  Do you understand that?

15                   THE DEFENDANT: Yes.

16                   THE COURT:  You're entitled to have an

17   attorney represent you, and if you can't afford one, the

18   Court would appoint one at public expense.   Do you

19   understand that?

20                   THE DEFENDANT: Yes.

21                   THE COURT:  At trial you'd be entitled to

22   call witnesses to testify for you, and you could force

23   those people to come to court by serving subpoenas on

24   them.   Do you understand that?

25                   THE DEFENDANT: Yes.

1          THE COURT:  You'd also have the right to
2    confront and cross-examine every witness that the State
3    would call at your trial.   Do you understand that?
4          THE DEFENDANT: Yes.
5          THE COURT:  You'd have the right to remain
6    silent and choose not to testify at trial, and no one
7    could force you to testify.  Do you understand that?
8          THE DEFENDANT: Yes.
9          THE COURT:  And if you made that decision
10   and chose not to testify, the prosecutor could not argue
11   to the jury that you must be guilty because you didn't
12   take the stand and testify in your own defense.   Do you
13   understand that?
14         THE DEFENDANT: Yes.
15         THE COURT:  At trial the State would have
16   the burden of proof.   The State would have to prove
17   each element beyond a reasonable doubt, and the jury's
18   verdict would have to be unanimous in order to convict
19   you.   Do you understand that?
20         THE DEFENDANT: Yes.
21         THE COURT:  And do you understand that by
22   pleading guilty here today, you would be giving up all
23   of the rights that we've just talked about?
24         THE DEFENDANT: Yes.
25         THE COURT:  By law you are presumed innocent

1  until such time, if ever, that the State proves you

2  guilty beyond a reasonable doubt, but by pleading guilty

3  here today, you are admitting your guilt and that

4  presumption of innocence no longer exists. Do you

5  understand that?

6            THE DEFENDANT: Yes.

7            THE COURT: Are you a U.S. citizen?

8            THE DEFENDANT: Yes.

9            THE COURT: Okay. Let me walk you through

10  these two charges, and I'm going to tell you everything

11  that the State would have to prove. Keep in mind that

12  the State would have to prove the elements separately

13  and beyond a reasonable doubt on each element. So for

14  the two counts, both counts pertain to April 12 of 2010.

15  Do you understand that, sir?

16            THE DEFENDANT: Yes.

17            THE COURT: Both counts allege delivery of

18  heroin in Dubuque County, Iowa. Do you understand that?

19            THE DEFENDANT: Yes.

20            THE COURT: Okay. So the State would have

21  to prove on each count that on or about April 12 of

22  2010, in Dubuque County, Iowa, you knowingly and

23  intentionally delivered to another person a substance

24  that you knew to be heroin. Do you understand that?

25            THE DEFENDANT: Yes, sir.

1          THE COURT:  Okay.  And with two separate

2  counts, the State would have to prove that you did this

3  on two separate occasions on that date.  Is that clear?

4          THE DEFENDANT: Yes.

5          THE COURT:  Okay.  You wanted to do this by

6  an Alford plea.  What I'm going to ask you is that

7  understand that if we have a trial and we have a jury

8  here or a judge, if there's no jury, the judge or the

9  jury has to accept, has to find what the State claims,

10  has to find that the State proved those elements beyond

11  a reasonable doubt.  Do you understand that?

12          THE DEFENDANT: Yes.

13          THE COURT:  Your options would be plead to

14  something, enter a plea, or go to trial and make the

15  State prove you guilty.  Do you understand that?

16          THE DEFENDANT: Yes.

17          THE COURT:  Do you believe it's in your best

18  interest to enter this plea here today rather than go to

19  trial?

20          THE DEFENDANT: Yes.

21          THE COURT:  I'm not going to ask you if you

22  actually did deliver heroin on two occasions on April 12

23  of 2010 in Dubuque County, Iowa.  I'm going to ask you

24  based on the evidence that you've seen and what you've

25  read about the witnesses and what the witnesses would

knowingly and voluntarily entered his plea, that he
fully understands his rights, and that there is a
factual basis for the plea.

Any challenges to this guilty plea based on
alleged defects in the plea proceeding must be raised in
a Motion in Arrest of Judgment. The failure to raise
these challenges precludes the right to raise them on
appeal. Such a motion must be filed within 45 days of
today's date but not less than five days before the
sentencing date, and we'll order PSI and set sentencing
for February 6 at 9 a.m.

MR. NELSON: If I may, Your Honor?
Mr. Rhodes has been incarcerated for approximately two
and a half months. He is in jail presently, and it's
just not right to leave him sit for another six to eight
weeks. Could we get an expedited PSI and have them do
that or would the Court be interested in being bound by
this agreement and going forward with sentencing today
so that we could get him started on his probation?

THE COURT: I won't agree to sentence him
today only because the sentence might be totally
appropriate, it might not be, I don't know, and that's
part of the benefit of having a PSI. If, for example,
he had a terrible criminal history and there were other
aggravating circumstances, the Court may not follow this

1   say if they came into court and testified, do you

2   believe it's likely that a jury would find you guilty of

3   two counts of delivery of heroin?

4               THE DEFENDANT: Yes.

5               THE COURT:  Okay.  And again, you believe

6   it's in your best interest to plead guilty here today,

7   sir?

8               THE DEFENDANT: Yes.

9               THE COURT:  With respect to Count I,

10  Delivery of Heroin, a Class C felony, how do you plead?

11              THE DEFENDANT: Alford plea.

12              THE COURT:  Do you plead guilty by Alford

13  plea?

14              THE DEFENDANT: Yeah.

15              THE COURT:  Okay.  With respect to Count

16  II, Delivery of Heroin, a Class C felony, how do you

17  plead?

18              THE DEFENDANT: Guilty to Alford plea.

19              THE COURT:  Okay.  Very good.  Mr. Nelson,

20  do you know of any reasons these pleas should not be

21  accepted?

22              MR. NELSON: No reason, Your Honor.

23              THE COURT:  Ms. Barnes.

24              MS. BARNES: No, Your Honor.

25              THE COURT:  I do find that the Defendant has

1  agreement.  A different sentence might be imposed.   I

2  don't know that.   So I'm not going to sentence him

3  today.   I set his date for eight weeks, and that's

4  typically the fastest that we can get a PSI prepared.

5           MR. NELSON: Well, Your Honor, they can do

6  that in two weeks if you press them.

7           THE COURT:  If you get that accomplished,

8  we'll move his sentencing date up, but for now I'm going

9  to set it for February 6 at 9 a.m.   Okay.

10          And then, Mr. Nelson, maybe you can check

11  with Mr. Gallagher on the SR file and just confirm with

12  him that he's willing to dismiss that.

13          MR. NELSON: That is what we had in mind.

14          THE COURT:  Very good.   Thank you.

15          (The hearing was concluded at 10:39 a.m. on

16  December 12, 2016.)

17

18

19

20

21

22

23

24

25

```
1    IN THE IOWA DISTRICT COURT IN AND FOR DUBUQUE COUNTY

2
     STATE OF IOWA,              )
3                               )  CASE NO. FECR093623
            Plaintiff,          )
4                               )
     vs.                        )  REPORTER'S CERTIFICATE
5                               )
     DANTE RHODES,              )
6                               )
            Defendant.          )
7

8

9          I, Kelly Jo Neyen, Certified Shorthand Reporter,
     hereby certify that I am one of the Official Shorthand
10   Reporters in and for the First Judicial District of
     Iowa, of which Dubuque County is part; that I, by order
11   and at the direction of the presiding judge, took down
     in machine shorthand the proceedings had or required to
12   be kept in the above-entitled cause; that the above and
     foregoing is a full, true and complete transcript of my
13   shorthand notes so taken.

14         Dated at Dubuque, Iowa, this 23rd day of March,
     2021.
15

16

17
            _Kelly Neyen_____
18          KELLY JO NEYEN, CSR, RPR
            Kelly.neyen@iowacourts.gov
19

20

21

22

23

24

25
```

EXHIBIT (2)


FEBRUARY 2, 2018          CASE NO. FECR093623
TRANSCRIPT OF PLEA SENTENCING AND PROBATION REVOCATION
DUBUQUE COUNTY COURTHOUSE
HON. MICHAEL J. SHUBATT, JUDGE
STATE OF IOWA
V.
DANTE RHODES

```
 1           IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

 2    STATE OF IOWA,                )
                                    )
 3            Plaintiff,            )     CASE NO. FECR093623
                                    )
 4       vs.                        )     TRANSCRIPT OF
                                    )     PLEA, SENTENCING
 5    DANTE K. RHODES,              )     and PROBATION
                                    )     REVOCATION
 6            Defendant.            )

 7

 8                        February 2, 2018
                      Dubuque County Courthouse
 9                      Dubuque, Iowa 52001

10                        10:42 a.m.

11

12    BEFORE:  HON. MICHAEL J. SHUBATT, Judge

13    APPEARANCES:

14         BRIGIT BARNES, ESQ.
           County Attorney's Office
15         Fourth Floor Courthouse
           Dubuque, Iowa 52001
16
               Appeared on behalf of the State of Iowa.
17
           CHRISTOPHER WELCH, ESQ.
18         Public Defender's Office
           Iowa Street
19         Dubuque, Iowa 52001

20             Appeared on behalf of the Defendant.

21    REPORTER:      Phoebe L. Miller CSR, RMR          APR 1 4 2021
                     Dubuque County Courthouse
22                   Dubuque, IA  52001

23

24    APPEALED:    February 9, 2021
      ORDERED:     March 2, 2021
      DELIVERED:   April 6, 2021
25
```

1          (The following commenced February 2, 2018, at

2     10:42 a.m.)

3          THE COURT:  This is State of Iowa v. Dante

4     Rhodes.  It is FECR123167 and FECR122938, Iowa

5     District Court for Dubuque County.  There is a

6     memorandum of plea negotiation filed.  It discusses

7     numerous other cases that are to be dismissed.

8     Defendant is here with his attorney, Christopher

9     Welch; the State appears by Assistant County Attorney

10    Brigit Barnes.

11         The plea memorandum reflects that in FECR122938

12    defendant will plead guilty to the charge of Eluding.

13    He will stipulate to a probation revocation in

14    FECR093623.  Numerous charges will be dismissed.  The

15    State will recommend a five-year prison sentence on

16    the Eluding charge.  The ten-year sentence on the

17    probation revocation will be imposed.  They will run

18    concurrent with one another.  Defendant joins in the

19    recommendation and agrees to make restitution as

20    determined by the Court.  The plea agreement is not

21    binding.

22         Is that an accurate statement of the plea

23    agreement?

24         MR. WELCH: It is.  The only thing I would add,

25    your Honor, the defendant was actually sentenced

1  federally since this plea memo was drafted.  As an

2  extension of these charges, the defendant was given a

3  nine-year prison sentence federally.  The defendant

4  would serve his time federally and that would be

5  concurrent with the State time that he's to get today.

6  THE COURT:  So he'll be allowed to receive

7  credit for the federal time that he serves toward the

8  State sentence.

9  MR. WELCH:  Correct.

10  THE COURT:  All right.  Is that an accurate

11  statement of the plea agreement as you understand it,

12  Ms. Barnes?

13  MS. BARNES:  Yes, your Honor.

14  THE COURT:  All right.  Mr. Rhodes, is that

15  what you understood is going on?

16  THE DEFENDANT:  Yes, your Honor.

17  THE COURT:  All right.  I need to ask you some

18  questions to make sure you understand your rights.  If

19  I explain any rights that you don't understand, let me

20  know.  I'll back up and try it a different way.  If

21  you want to take a break and talk to Mr. Welch in

22  private, just tell me and I'll make that happen.

23  Lastly, if you change your mind for any reason,

24  you decide that you do not want to enter this plea,

25  you will not owe me an explanation.  I'll simply reset

1  your case for trial, okay?

2         THE DEFENDANT:  Yes, your Honor.

3         THE COURT:  Hold on just a second.  Hey, Shane,

4  can you shut that door, please?  Thank you.  How old a

5  man are you?

6         THE DEFENDANT:  Forty-one.

7         THE COURT:  Can you read and write English?

8         THE DEFENDANT:  Yes, your Honor.

9         THE COURT:  Are you under a doctor's care for

10  anything?

11         THE DEFENDANT:  No.

12         THE COURT:  Do you have any kind of mental

13  health diagnosis?

14         THE DEFENDANT:  No.

15         THE COURT:  Are you taking any prescription or

16  over-the-counter medication?

17         THE DEFENDANT:  No.

18         THE COURT:  Are you under the influence of an

19  alcoholic beverage or drug?

20         THE DEFENDANT:  No.

21         THE COURT:  Mr. Rhodes, has anybody forced you,

22  intimidated you or harassed you in order to get you to

23  enter this plea?

24         THE DEFENDANT:  No.

25         THE COURT:  Is this your own decision after

1    talking it over with Mr. Welch?

2         THE DEFENDANT:  Yes.

3         THE COURT:  Are you satisfied with his

4    services?

5         THE DEFENDANT:  Yes.

6         THE COURT:  There was a Trial Information that

7    was filed in FECR122938.  That's the Eluding charge.

8    There is also a Report of Violation that was filed in

9    FECR093623.  That's the probation charge.  Did you

10   read both of those documents?

11        THE DEFENDANT:  Yes.

12        THE COURT:  Mr. Welch, are you aware of any

13   defenses available to Mr. Rhodes on the Eluding or the

14   probation revocation other than general denials?

15        MR. WELCH:  No, your Honor.

16        THE COURT:  Mr. Rhodes, the Eluding charge is a

17   class D felony.  It carries with it a maximum penalty

18   of five years in prison and a fine of somewhere

19   between $750 and $7500.  Do you understand those

20   maximums?

21        THE DEFENDANT:  Yes.

22        THE COURT:  The probation case it looks like

23   has a suspended ten-year sentence and five was

24   previously suspended.  Do you understand that?

25        THE DEFENDANT:  Yeah.

1    THE COURT:  Do you understand that your plea

2  agreement is not binding on the Court, meaning that

3  the Court could at time of sentencing, if it thought

4  it was appropriate for any reason, run the sentences

5  consecutive to make a total of 15 years and could, if

6  it thought it was appropriate for any reason, make it

7  consecutive to or in addition to any federal time you

8  serve?  Do you understand that?

9    THE DEFENDANT:  Yeah.

10    THE COURT:  Has anybody made you any promise or

11  guarantee as to what would happen if you plead guilty?

12    THE DEFENDANT:  No.

13    THE COURT:  You're waiving a number of rights

14  by pleading guilty.  You have the right to have a

15  speedy and public trial by jury.  If you could not

16  afford an attorney, Mr. Welch would continue to

17  represent you at public expense.  At the trial the

18  State would have to put on witnesses and evidence in

19  order to establish your guilt beyond a reasonable

20  doubt.

21    Your attorney could confront and cross-examine

22  those witnesses and he could challenge the evidence.

23  He could call witnesses in your own defense.  If they

24  would not come to court voluntarily, he could compel

25  their attendance with a subpoena.  Do you understand

 1    that you're waiving those rights by pleading guilty?

 2            THE DEFENDANT: Yeah.

 3            THE COURT:  You could testify or not testify as

 4    you so chose at trial.  If you chose not to testify, I

 5    would not allow the State to comment on that fact to

 6    the jury.  Do you understand you're waiving that right

 7    by pleading guilty?

 8            THE DEFENDANT:  Yes.

 9            THE COURT:  You are presumed to be innocent;

10    however, by pleading guilty you're waiving the

11    presumption of innocence.  Do you understand that?

12            THE DEFENDANT:  Yes.

13            THE COURT:  Are you a U.S. citizen?

14            THE DEFENDANT:  Yeah.

15            THE COURT:  Are you on probation or parole?

16            THE DEFENDANT:  Yes.

17            THE COURT:  Well, you're -- you're sentenced

18    federally, I understand, and you're on probation in

19    this case that we're talking about here today.

20            THE DEFENDANT:  Right.

21            THE COURT:  Okay.  Any other probations or

22    paroles?

23            THE DEFENDANT:  No.

24            THE COURT:  With regard to the Eluding charge,

25    there were Minutes of Testimony filed with that Trial

1  Information.  The Minutes of Testimony listed the
2  witnesses that would be called against you if the
3  State were to go to trial with the case.  It also
4  contained a summary of what the State -- or what the
5  State believes those witnesses would say under oath.
6  Did you review that document?
7            THE DEFENDANT: Yeah.
8            THE COURT:  If those witnesses came to court
9  and testified to the things that are set forth in the
10  Minutes, would they be telling the truth?
11           THE DEFENDANT:  Yeah.
12           THE COURT:  The State would have to prove the
13  following things in order to establish your guilt in
14  this matter.  When I say the State must prove
15  something, it must always be beyond a reasonable
16  doubt.  Do you understand that?
17           THE DEFENDANT:  Yeah.
18           THE COURT:  First, the State would have to
19  prove that on March 8th of 2017 in Dubuque County,
20  Iowa you were operating a motor vehicle.  Do you think
21  the State can prove that?
22           THE DEFENDANT:  Yes.
23           THE COURT:  The State would have to prove that
24  at that time you wilfully failed to bring that motor
25  vehicle to a stop or otherwise attempted to elude a

1    marked law enforcement vehicle.  Do you think the

2    State could prove that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Do you think the State could prove

5    that the law enforcement vehicle was driven by a

6    uniformed peace officer?

7            THE DEFENDANT:  Yes.

8            THE COURT:  Do you think the State could prove

9    that you continued to fail to stop or otherwise eluded

10    after being given a visual and audible signal to stop?

11            THE DEFENDANT:  Yes.

12            THE COURT:  And do you believe that the State

13    could prove that in so doing you exceeded the legal

14    speed limit by 25 miles per hour or more?

15            THE DEFENDANT:  Yes.

16            THE COURT:  Mr. Welch, do you know of any

17    reason I should not accept the plea?

18            MR. WELCH:  No, your Honor.

19            THE COURT:  Ms. Barnes?

20            MS. BARNES:  No, your Honor.

21            THE COURT:  Mr. Rhodes, any questions about

22    your rights in connection with that charge?

23            THE DEFENDANT:  No.

24            THE COURT:  Do you still want to enter a plea?

25            THE DEFENDANT:  Yes.

1    THE COURT:  How do you plead to the charge of

2  Eluding?

3         THE DEFENDANT:  Guilty.

4    THE COURT:  I'm going to accept your guilty

5  plea as knowingly and voluntarily entered into.  I

6  think you understand your rights and consequences of

7  the plea.  I also find there is a factual basis for

8  the plea.  The factual basis is contained in the

9  Minutes of Testimony and your own admissions here in

10 Court today.

11        I did fail to mention that you could be

12 responsible for court-appointed attorney fees,

13 although you have a right to be heard on that, also

14 surcharges required by law, and court costs.  Do you

15 understand that?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Does that make you want to withdraw

18 the plea that you just gave?

19        THE DEFENDANT:  No.

20        THE COURT:  Let's go off the record for a

21 second.

22        (A short off the record discussion was held.)

23        THE COURT:  All right, so let's go back on the

24 record now.  Mr. Rhodes, your rights are slightly

25 different with regard to the probation revocation

1  hearing.  There was a Report of Violation filed in

2  that case and you said that you read that.  Do you

3  understand that if you wanted to have a hearing that

4  you would be entitled to that; the State would have to

5  put on witnesses and evidence to prove by a

6  preponderance of the evidence that you had violated

7  your probation in one or more of the ways set forth in

8  the report?

9       THE DEFENDANT:  Yes.

10      THE COURT:  And do you understand that Mr.

11  Welch would represent you at public expense and all

12  the things that I already talked about as far as

13  rights that you would have in a trial would apply?  He

14  could call witnesses, he could subpoena them, you

15  could testify or not testify.

16      THE DEFENDANT:  Yes.

17      THE COURT:  You understand you're waiving all

18  those rights and we would not be having a hearing on

19  the probation.

20      THE DEFENDANT:  Yes.

21      THE COURT:  And do you understand that even if

22  you violated your probation, you would still have a

23  right to be heard to, say, make an argument at least

24  that your probation should not be revoked?

25      THE DEFENDANT:  Yes.

1          THE COURT:  Are you wanting today to stipulate

2     to your probation revocation and -- or violation and

3     revocation as part of this plea arrangement?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Has anybody forced you, intimidated

6     you or harassed you to do that?

7          THE DEFENDANT:  No.

8          THE COURT:  Mr. Welch, do you know of any

9     reason I should not accept the probation stipulation?

10         MR. WELCH:  No, your Honor.

11         THE COURT:  Ms. Barnes?

12         MS. BARNES:  No, your Honor.

13         THE COURT:  All right.  Mr. Rhodes, do you

14    stipulate and agree that you violated your probation

15    as set forth in the Report of Violation filed in

16    FECR093623?

17         THE DEFENDANT:  Yes.

18         THE COURT:  I'm going to accept your

19    stipulation as knowingly and voluntarily entered into

20    and as having a basis in fact.  My understanding is

21    that you would like to move forward with disposition,

22    not only on your probation revocation but also with

23    sentencing on the eluding charge today.  Is that

24    correct?

25         THE DEFENDANT:  Yes.

1      THE COURT:  You would be waiving a number of

2    rights by doing that.  First you have the right in the

3    eluding case to have a 15-day delay between the guilty

4    plea and sentencing.  Do you understand you're waiving

5    that right?

6      THE DEFENDANT:  Yes.

7      THE COURT:  You have the right to have the

8    Court use a presentence investigation report at

9    sentencing.  That's a document that would be prepared

10   by the Department of Correctional Services with

11   information about your background and would contain a

12   recommendation as to what the sentence should be.

13   That recommendation may be something less than prison.

14   Do you understand you're waiving your right to have a

15   PSI used?

16     THE DEFENDANT:  Yes.

17     THE COURT:  You have the right to file a Motion

18   in Arrest of Judgment.  That's your way to challenge

19   the procedures I used in taking the guilty plea.  It's

20   a time-sensitive motion that has to be filed within

21   45 days of today's date and no later than five days

22   prior to sentencing.

23     If you waive your right to file that motion by

24   going forward today thus not being able to meet those

25   timelines, you will be waiving your right to challenge

1    the guilty plea itself and any appeal.  Do you

2    understand that?

3            THE DEFENDANT:  Yes.

4            THE COURT:  Knowing that, do you still want to

5    go forward with sentencing?

6            THE DEFENDANT:  Yes.

7            THE COURT:  Mr. Welch, do you know of any

8    reason I should not go forward with sentencing?

9            MR. WELCH:  No, your Honor.

10           THE COURT:  Ms. Barnes?

11           MS. BARNES:  No, your Honor.

12           THE COURT:  I'll hear from the State first.

13   Ms. Barnes?

14           MS. BARNES:  Nothing other than to ask the

15   Court to accept the plea negotiations.  Thank you.

16           THE COURT:  Mr. Welch?

17           MR. WELCH:  Thank you, your Honor.  We think

18   the plea agreement is entirely appropriate given the

19   length of time he has to serve federally.  He also

20   cooperated with the federal government.  His

21   co-defendant got a lengthy prison sentence, as did Mr.

22   Rhodes.  I think that's appropriate -- I think that

23   this term is appropriate given his level of

24   cooperation with the feds.

25           I know the federal PSI was completed and they

1  had everything that they wanted out of Mr. Rhodes.  He
2  was very cooperative.  In fact, he's actually, I
3  think, excited about going to federal prison.  For
4  those reasons, your Honor, we'd ask that you to follow
5  the plea agreement and sentence him to concurrent
6  time.
7          THE COURT:  All right.  Mr. Rhodes, is there
8  anything that you want to say prior to my imposition
9  of sentence? You have that right.
10          THE DEFENDANT:  No.
11          THE COURT:  All right.  I'm going to accept the
12  plea agreement of the parties with regard to
13  FECR122938.  I am going to sentence you to an
14  indeterminate term not to exceed five years.  That
15  term is imposed.  It will not be suspended.  I am
16  going to set the minimum fine of $750; however, I am
17  going to suspend that.  I'm also going to waive any
18  requirement that defendant make any reimbursement for
19  court-appointed attorney fees because he does not have
20  reasonable ability to do that given his incarceration.
21  All fines and surcharges that are are required by
22  law -- or all surcharges, I should say, required by
23  law will be imposed.  Defendant will have a right to
24  appeal on that charge.
25          Mr. Rhodes, if you disagree with my ruling you

1          THE COURT:  All right, we'll close the record.

2          MS. BARNES:  Thank you.

3          THE COURT:  Thank you.

4          (The above plea, sentencing and probation

5    revocation hearing concluded February 2, 2018, at

6    11:02 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE IOWA DISTRICT COURT FOR DUBUQUE COUNTY

```
STATE OF IOWA,              )
                           )
        Plaintiff,         )     CASE NO. FECR093623
                           )
    vs.                    )     REPORTER'S CERTIFICATE
                           )
DANTE RHODES,              )
                           )
        Defendant.         )
```

        I, Phoebe L. Miller, hereby certify that I am one of the Official Shorthand Reporters in and for the First Judicial District of Iowa, of which Dubuque County is part; that I am the one who, by order and at the direction of the presiding Judge, took down in machine shorthand the proceedings had or required to be kept in the above-entitled cause; that the above and foregoing is a full, true and complete transcript of my shorthand notes so taken.

        Dated at Dubuque, Iowa, this 26th day of March, 2021.

                              /s/ *Phoebe L. Miller, CSR-RMR*
                              Phoebe L. Miller, CSR, RMR

EXHIBIT (3)


MARCH 18, 2021 TRANSCRIPT OF PROCEEDINGS
        HON. MICHAEL J. SHUBATT, JUDGE
 IOWA STATE              CASE NO. PCCV107576
        V.
 DANTE RHODES
IN THE IOWA DISTRICT COURT, DUBUQUE COUNTY

```
 1        IN THE IOWA DISTRICT COURT IN AND FOR DUBUQUE COUNTY

 2

 3   DANTE K. RHODES,                 )
                                      )
 4          Petitioner,              )        Case No. PCCV107576
                                      )
 5   vs.                             )
                                      )
 6   STATE OF IOWA,                   )        TRANSCRIPT OF PROCEEDINGS
                                      )
 7          Respondent.              )

 8

 9

10

11          TRANSCRIPT OF PROCEEDINGS taken on March 18,
     2021, at the Dubuque County Courthouse, 720 Central
12   Avenue, Dubuque, Iowa, before Carrie L. Nauman,
     Certified Shorthand Reporter of Iowa.
13

14

15

16   BEFORE:

17          The Honorable Michael J. Shubatt.

18

19

20   APPEARANCES:

21          ATTORNEY JOEY T. HOOVER, Hoover Law Firm,
     110 West Main Street, Epworth, Iowa, 52045; Counsel for
22   the Petitioner.

23          ATTORNEY SHEA CHAPIN, Assistant Dubuque County
     Attorney, 720 Central Avenue, Dubuque, Iowa, 52001;
24   Counsel for the State of Iowa.

25
```

1    THE COURT: Okay. Let's go ahead and go on

2    the record. This is Dante Rhodes, Plaintiff versus

3    State of Iowa, Defendant. It is PCCV107576. Iowa

4    District Court for Dubuque County. The matter was

5    scheduled for trial today. Through informal discussions

6    with counsel yesterday, I learned that the trial was

7    going to be conducted -- or basically the case was going

8    to be submitted on depositions and exhibits, so there

9    would be no live testimony. And Defendant was waiving

10   his right to appear.

11       So, in light of the Corona virus issues

12   facing the Court, we are conducting this by telephone

13   for a brief record this morning.

14       Attorney Joey Hoover appears on behalf of

15   Plaintiff, and Assistant County Attorney Shea Chapin

16   appears on behalf of the State of Iowa.

17       Mr. Hoover, am I correct, has your client

18   been advised of his right to participate telephonically

19   and has he also waived that right?

20       MR. HOOVER: Yes, Your Honor. I had

21   discussions with him on both his rights and his

22   willingness to waive presence by telephone for the

23   actual trial, and he was agreeable to waiving that

24   right.

25       THE COURT: Very good. Why don't you go

1  ahead and tell me what it is that you are submitting as

2  Plaintiff's evidence in the case.

3             MR. HOOVER:  Yes, Your Honor.  We have an

4  agreement that all exhibits that have been uploaded at

5  this point would be agreed that they could be admitted.

6  I have Petitioner's I believe 1 through -- I just want

7  to make sure I get this right.  1 through 7.  And I

8  believe the State has A through E.

9             MS. CHAPIN:  Yes.

10            THE COURT:  The only things that are uploaded

11 right now, and they're still awaiting approval, are the

12 deposition transcripts of Shane Flesher, Deron Coleman,

13 Scott Nelson, Mary Terrell and Dante Rhodes.  Those are

14 the only things that have been uploaded.  So I don't

15 know what else you're referring to.

16            MR. HOOVER:  Previously we uploaded the

17 proposed exhibits when we were supposed to have the

18 original trial.

19            THE COURT:  Oh, okay.  So I see that A

20 through E, which would be the State's records, those

21 were previously uploaded.  I was on the wrong screen

22 there, so I apologize.

23            MR. HOOVER:  Yep.  No problem.

24            THE COURT:  And then I have Petitioner's 1

25 through 7 for exhibits, and then the depositions also.

1    That's what are waiting to be approved.  So I think I

2    have everything that you're referring to.

3                    MR. HOOVER:  Correct.

4                    THE COURT:  Okay.  All right.

5                    MR. HOOVER:  And I know I spoke with

6    Ms. Chapin, and we were wondering if the Court would

7    grant us 10 to 14 days to do written closing arguments.

8                    THE COURT:  Well, we're not in a terrible

9    rush these days, so 14 days is fine.  We will deem the

10   case submitted -- I will consider the evidentiary record

11   closed based on the depositions and the exhibits that

12   were referenced.  We will consider the evidentiary -- we

13   will consider the case is submitted on April 1.  Or even

14   if you want the end of that week, April 3rd, would be

15   fine.  And at that point I'll take it under advisement.

16                   MS. CHAPIN:  Okay.

17                   THE COURT:  So should we say April 3?

18                   MS. CHAPIN:  That would be great.  Thank you,

19   Judge.

20                   MR. HOOVER:  That works for me, Your Honor.

21                   THE COURT:  Then I'll enter a brief order

22   concerning our record today.  Is there anything else

23   from the Plaintiff?

24                   MR. HOOVER:  No, Your Honor.

25                   THE COURT:  And from the State?

1          MS. CHAPIN:  No, Your Honor.  Thank you.

2          THE COURT:  All right.  Thank you, both.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        C E R T I F I C A T E

2

3

4              I, the undersigned, Carrie L. Nauman, do

5       hereby certify that I did report the foregoing

6       proceedings at the time, date and place hereinbefore

7       indicated, and that the transcript is a true record of

8       the proceedings.

9              I further certify that I am neither attorney

10      or counsel for, nor related to or employed by any of the

11      parties to the action in which these proceedings were

12      reported, and further that I am not a relative or

13      employee of any attorney or counsel employed by the

14      parties hereto or financially interested in the action.

15             Dated at Dubuque, Iowa, this 5th day of

16      March, 2021.

17

18

19

20                      CARRIE L. NAUMAN, CSR, RPR
                        Dubuque County Courthouse
21                      720 Central Avenue
                        Dubuque, Iowa 52001
22                      563/589-4481
                        Carrie.Nauman@iowacourts.gov
23

24

25
```